456 So.2d 939 (1984)
Glenn R. JOHNSTON, M.D., Appellant,
v.
DEPARTMENT OF PROFESSIONAL REGULATION, BOARD OF MEDICAL EXAMINERS, Appellee.
No. AX-322.
District Court of Appeal of Florida, First District.
September 13, 1984.
Rehearing Denied October 12, 1984.
*940 Paul Watson Lambert, of Slepin, Slepin, Lambert & Waas, Tallahassee, for appellant.
William M. Furlow, Dept. of Professional Regulation, Tallahassee, for appellee.
WIGGINTON, Judge.
Appellant, Dr. Johnston, appeals a final order of the Board of Medical Examiners (Board) which rejected the hearing officer's recommendation that charges against appellant *941 of violation of sections 458.331(1)(q) and (t), Florida Statutes, be dismissed. Appellant was charged by administrative complaint with thirteen counts of violations of section 458.331(1), Florida Statutes, concerning the inappropriate prescribing of controlled substances to four patients. At the hearing, eight of the thirteen counts were dismissed, leaving five counts to be prosecuted as to violations of section 458.331(1)(q) and (t). We reverse and remand for entry of an order dismissing the administrative complaint with prejudice.
Dr. Johnston is a board certified family practice physician with over fourteen years experience. He served four years as Chief of the Family Practice Department at the Naval Regional Medical Center in Orlando. He is now engaged in private practice. He never before had been the subject of an investigation by the Department of Professional Regulation (Department) until the filing of the charges in this case.
Section 458.331(1)(q), Florida Statutes, provides for the taking of disciplinary action against a physician for:
Prescribing, dispensing, administering, mixing, or otherwise preparing a legend drug, including any controlled substance, other than in the course of the physician's professional practice. For the purposes of this paragraph, it shall be legally presumed that prescribing, dispensing, administering, mixing, or otherwise preparing legend drugs, including all controlled substances, inappropriately or in excessive or inappropriate quantities is not in the best interest of the patient and is not in the course of the physician's professional practice, without regard to his intent.
Section 458.331(1)(t) provides for disciplinary action to be taken against a physician for:
Gross or repeated malpractice or the failure to practice medicine with that level of care, skill, and treatment which is recognized by a reasonably prudent similar physician as being acceptable under similar conditions and circumstances. The board shall give great weight to the provisions of s. 768.45 when enforcing this paragraph.
At the hearing, the evidence showed that between the dates of approximately July 1, 1980, and November, 1981, appellant prescribed large doses of Dilaudid (a schedule II controlled substance) to four patients, all of whom have serious medical problems and suffer chronic severe pain, for which Dilaudid provides the only substantial relief.[1] The department presented the testimony *942 of only one witness, a general practitioner who is not board certified. The witness was of the opinion that Dr. Johnston's prescribing of Dilaudid in the quantities alleged to each of the four patients was not medically justifiable and that the quantities were excessive. However, he neither saw nor examined the patients and was not able to tell from reviewing their records how much pain any of the four patients was experiencing. He conceded that a medically justifiable purpose in treating a patient is achieved by a treatment that enhances the well-being of the patient and enhances the quality of the patient's life. He felt that Dr. Johnston's prescription of the quantities of Dilaudid in question to a patient with any history other than terminal cancer was a gross departure from acceptable medical practice and that three months is the maximum length of time Dilaudid should be prescribed to a patient. However, he could testify as to no physical harm to any of the four patients resulting from appellant's treatment and could not testify that appellant prescribed Dilaudid other than in the course of his medical practice.
Dr. Johnston presented the testimony of three expert medical witnesses, all of whom are board certified in family practice. Except for the agreement of all four testifying doctors that the four patients suffered no physical harm from their treatment by Dr. Johnston and that Dr. Johnston prescribed the drug to the four patients in the course of his medical practice, the testimony of Dr. Johnston's three witnesses contradicted the testimony of the department's witness in that those three doctors felt that Dr. Johnston acted reasonably in his treatment of the four patients. The evidence also showed that the Physician's Desk Reference (PDR) does not place a cap on the quantity of Dilaudid to be prescribed for a patient in chronic moderate to severe pain.[2] The amounts of Dilaudid prescribed for each of the four patients did not exceed the PDR recommendations. The evidence also indicated that at least some of the four patients were possibly already habituated or tolerant to the drug Dilaudid at the time Dr. Johnston prescribed it for them.
Relying upon the testimony of the three board certified family practice physicians, the testimony of Dr. Johnston and the PDR, the hearing officer found that prescribing Dilaudid to a patient who is already habituated or tolerant to the drug and who has chronic moderate to severe pain can be medically justifiable since the patient should be given relief from pain. He determined that appellant's prescriptions of the quantities of Dilaudid for the four patients during the time period alleged in the complaint were neither excessive nor inappropriate, especially considering the severe conditions of each of the patients. He concluded that the evidence presented by the department was not substantially sufficient to establish violations of section 458.331(1)(q) or (t), especially in light of Bowling v. Department of Insurance, 394 So.2d 165 (Fla. 1st DCA 1981). He found that appellant's treatment of the four patients was reasonable under the circumstances.
Upon consideration by the board, the members, with one dissent, voted to reject the hearing officer's findings of fact and conclusions of law and to adopt the allegations of the administrative complaint as the statements of fact in this case. However, in its final written order, the board stated that with two exceptions it approved and adopted the hearing officer's findings. The first exception was the finding that appellant's *943 prescriptions of Dilaudid to the four patients in the quantities alleged were appropriate and not excessive and did not constitute the failure to practice medicine with the level of care, skill and treatment which is recognized by a reasonable and prudent physician as being acceptable. The board also rejected the hearing officer's finding that to treat with Dilaudid a patient who suffers chronic moderate to severe pain and who is already habituated to the drug is medically proper. The board based its rejection of the above findings on the board's special knowledge and expertise in the practice of medicine, in reliance on the recognition in McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977), that an agency may interpose its own special expertise in an area to override a hearing officer. The board then made its own findings that: to continue to treat a non-terminally ill patient for chronic moderate to severe pain by prescribing dosages of narcotics in the quantities and over the time periods alleged was not medically justifiable in this case; to prescribe narcotics in the quantities and over the time periods involved here merely for the treatment of pain was improper; and the prescriptions were inappropriate and "constituted the failure to practice medicine with the level of care, skill and treatment which is recognized by a reasonable and prudent physician as being acceptable." The board accepted the expert testimony of the department's witness as an accurate statement of the proper policy in prescribing narcotics to non-terminal patients. Thereupon, the board concluded that appellant had violated sections 458.331(1)(q) and (t), Florida Statutes, and placed appellant on probation for a period of one year, a condition of which appellant is required to make semiannual appearances before the board.
In our view, the circumstances of this case do not present a unique question that is not susceptible to ordinary methods of proof, resolution of which falls within the special expertise of the board to the point that the board may overturn the findings of the hearing officer when those findings are based upon competent substantial evidence in the record. In the absence of a special expertise situation, the board is bound by the findings of fact of a hearing officer as long as competent substantial evidence supports those findings. See Dade County Police Benevolent Association v. City of Homestead, 444 So.2d 465 (Fla. 3d DCA 1984). We find that competent substantial evidence supports the hearing officer's findings in this case.
Even when an agency is justified in substituting its own findings of fact for that of the hearing officer in cases where the expertise of the agency is a valid factor, in reviewing such a decision, this Court must consider the substantiality of the evidence supporting the agency's substituted findings. Westchester General Hospital v. Dept. of Health, 419 So.2d 705 (Fla. 1st DCA 1982). According to this Court's decision in Bowling v. Department of Insurance, 394 So.2d 165 (Fla. 1st DCA 1981), in a license discipline proceeding, "the term `substantial competent evidence' takes on vigorous implications that are not so clearly present on other occasions for agency action under chapter 120." The court declared:
[W]e differentiate between evidence which "substantially" supports conventional forms of regulatory action and evidence which is required to support "substantially" a retrospective characterization of conduct requiring suspension or revocation of the actor's license. At 171.
The court went on to hold:
[W]e glean a requirement for more substantial evidence from the very nature of licensee discipline proceedings: when the standards of conduct to be enforced are not explicitly fixed by statute or by rule, but depend on such debatable expressions as "in the applicable regular course of business"; when the conduct to be assessed is past, beyond the actor's power to conform it to agency standards announced prospectively; and when the proceeding may result in the loss of a valuable business or professional license, *944 the critical matters in issue must be shown by evidence which is indubitably as "substantial" as the consequences. At 172.
Even if the board were within an area of its special expertise, the evidence in support of the board's action does not meet that substantiality requirement. Compare Robinson v. Florida Bd. of Dentistry, 447 So.2d 930 (Fla. 3d DCA 1984). Neither the transcript of the board meeting nor the written final order of the board sets forth a reasonable basis in the form of articulation of the underlying medical reasons for invocation of the board's special insight and expertise, leaving this Court no avenue for review of the propriety of the board's rejection of the otherwise competent substantial evidence supporting the hearing officer's recommendation. That form of discipline affords licensees inadequate forewarning of proscribed priorities and subjects them to the possibility of an arbitrary judgment that chapter 120, Florida Statutes, was designed and enacted to prevent. We reverse the board's final order and remand for entry of an order dismissing with prejudice the administrative complaint against Dr. Johnston.
Dr. Johnston has petitioned this Court for an award of attorney's fees and costs pursuant to section 120.57(1)(b)9, Florida Statutes, which provides, in pertinent part:
In the event a court reverses the order of an agency, the court in its discretion may award attorney's fees and costs to the aggrieved prevailing party.
In his petition, Dr. Johnston charges that the department and the board have relentlessly prosecuted him in an egregious manner thereby causing him to incur total attorney's fees, expenses and costs in the amount of $39,825.41. The board, having made no presentation whatsoever in this appeal, has not responded to the motion for attorney's fees and costs. The department has neither filed a response or objection thereto nor did the attorney for the department, upon direct questioning at oral argument, raise any objection to the request. The record reveals that this case has been brought before a hearing officer on two different occasions and that on each the hearing officer recommended dismissal of the charges. Additionally, in light of the overwhelming evidence in favor of Dr. Johnston which the board callously overlooked behind its veil of "special insight," we find that application of section 120.57(1)(b)9 is appropriate in this case and that Dr. Johnston is entitled to an award of attorney's fees for all proceedings including this appeal and costs to be taxed against appellees pursuant to that statute. Therefore, we further remand this aspect of the case to the DOAH hearing officer to hold a fact finding hearing and to make recommendations to this Court as to the amount of awardable costs and attorney's fees for appellant at the hearing level and on this appeal. The hearing officer shall promptly consider this matter and file his report with this Court. We will then enter a separate order taxing the amount of costs and attorney's fees.
REVERSED AND REMANDED.
SMITH, and WENTWORTH, JJ., concur.
NOTES
[1] In his recommended order, the hearing officer set forth in detail the circumstances surrounding the prescription of the drug Dilaudid for each of the four patients. For example, as to one of the patients, he found as follows:

10. The Respondent prescribed Dilaudid to patient .. . for severe chronic pain associated with multiple medical problems, primarily related to his severe degenerative rheumatoid arthritis. [The patient] 49 years of age, had a long history of multiple joint pains, degeneration of his normal joints, chronic pain in his joints, swelling and abnormal laboratory tests. He had been diagnosed as having rheumatoid arthritis since 1976 by a neurosurgeon, confirmed by blood tests and x-rays. He was classified as 100 percent disabled in 1977 by the Veterans Administration because of the chronic joint pains of rheumatoid arthritis. He had been seen by numerous doctors and treated with various pain medications including Dilaudid, which was the only drug that allowed him to function. The pains, discomfort and disability that [the patient] suffered were located in most of the joints of his body, especially in his lumbosacral spine, with involvement in the left hip, shoulder areas, both knees and elbows, with swelling and deformity in the hands. Practically every joint in his body was involved. [The patient] frequently used a cane for walking, and occasionally used crutches. He had difficulty in standing from a sitting position and on occasion he used a wheelchair. The Respondent tried several different medications to treat his rheumatoid arthritis, in addition to physical therapy, and used various pain medications, but Dilaudid proved to be the best when used in conjunction with treatment medications that would allow [the patient] sufficient relief to work and function in a reasonably normal life-style. The Respondent prescribed 4 mg. Dilaudid tablets to [the patient] to be taken in doses within the limits recommended by the Physician's Desk Reference (PDR) in that the overall quantity prescribed for him did not exceed the maximum limit recommended by the PDR. [The patient] also had other medical problems appropriately treated by the Respondent, such as subdeltoid bursitis, lateral ankylosing spondylitis, spondylolisthesis, Reiter's Syndrome, cervical spondylosis and diabetes.
[2] The Physician's Desk Reference (1982) sets forth the following instructions relative to the use of Dilaudid:

The oral route of administration is effective for the treatment of moderate to severe pain. The usual oral dose is two milligrams every four to six hours as necessary. The dose must be individually adjusted according to severity of pain, patient response, and patient size. More severe pain may require three to four milligrams every four to six hours. If the pain increases in severity or relief is not adequate or a tolerance occurs, a gradual increase in dosage may be required. (At 1009).