463 So.2d 328 (1985)
Daniel J. CLARK, M.D., Appellant,
v.
DEPARTMENT OF PROFESSIONAL REGULATION, BOARD OF MEDICAL EXAMINERS, Appellee.
No. 83-675.
District Court of Appeal of Florida, Fifth District.
January 4, 1985.
Rehearing Denied February 7, 1985.
*329 Andrew A. Graham, of Reinman, Harrell, Silberhorn, Moule & Graham, P.A., Melbourne, Algis Augustine, of Augustine and Associates, Ltd., Chicago, Ill; and Steven I. Kern, P.A., Elizabeth, N.J., for appellant.
Joseph W. Lawrence, II, Chief Atty., and John E. Hale, Legal Assistant, Department of Professional Regulation, Tallahassee, for appellee.
ORFINGER, Judge.
This is an administrative appeal from an order of the Board of Medical Examiners of the Department of Professional Regulation *330 permanently revoking appellant Daniel Clark's medical license based on findings that Clark violated several provisions of the Florida Medical Practices Act, Chapter 458, Florida Statutes (1979) in his treatment of Verdi Hammond Burroughs and Charles Kirk.[1]
The scope of review of administrative action is narrow. Section 120.68(10), Florida Statutes (1983) provides that the reviewing court may not substitute its judgment for that of the agency on any disputed finding of fact, and may only set aside agency action which depends on findings of fact not supported by competent substantial evidence in the record. We are therefore bound to affirm administrative determinations or findings unless there is no competent substantial evidence to support them. Dade County Police Benevolent Assn. v. City of Homestead, 444 So.2d 465 (Fla. 3d DCA 1984).
The factual background of the case is set forth in the hearing examiner's findings of fact. The selective portion of these findings set forth below, all of which are amply supported by the record, chronicle Clark's treatment of patient Burroughs:
* * * * * *
3. Since 1979, he [Dr. Clark] has practiced medicine in Ormond Beach, Florida. Initially, his practice included gynecology, family practice, and general nutrition. He then began to treat cancer patients with metabolic (nutritional) therapy. The purpose of such therapy is to enhance the immunological and biological capacities of a patient  nutritionally, immunologically, and physiologically  in order to improve the patients [sic] performance in combating cancer. This cancer treatment includes the administration of Amygadalin [sic] (Laetrile), vitamins, herbal teas and detoxifiers, and the application of salves and packs to cause localized hyperthermia. It is not a conventional, orthodox, or widely practiced form of cancer treatment. No other physician in Volusia County uses it. Most accredited medical schools in the United States do not teach it. The American Medical Association (AMA) considers it to be experimental. Eventually, respondent's metabolic treatment of cancer patients began to account for 15% to 20% of his practice.
* * * * * *
12. Ms. Burroughs became respondent's patient on October 7, 1980, when she came to his office for medical treatment. He performed a complete workup, physical examination, and medical history, and reviewed the results of the lab blood tests. He concluded that her condition was essentially normal except for her right breast, which was severely inflamed and the nipple retracted. In addition, the lymph nodes under her right armpit were palpable and enlarged. His initial impression was that she had inflamatory [sic] carcinoma (cancer) of the right breast with lymph gland involvement. He then scheduled her for a biopsy, which was necessary before he could determine the type of cancer involved.
* * * * * *
14. During the October 7, 1980, office visit, respondent explained to Ms. Burroughs the alternative methods of cancer treatment, including their potential for cure. The methods discussed included surgery, radiation, chemotherapy, and metabolic therapy. She refused to undergo radiation or surgical treatment, explaining that her husband died of lung cancer after receiving surgery, radiation, and chemotherapy. She agreed however, to consider chemotherapy in conjunction with metabolic therapy. He explained to her that metabolic therapy was not a treatment against the cancer, per se, but that it would help "build up her body to where her own immune system would help her fight the cancer." She agreed to accept this treatment  chemotherapy *331 with metabolic therapy  then signed four separate affidavits on forms provided by respondent. The affidavits acknowledged her consent to the ordering and administration of Laetrile. Respondent, however, did not inform Ms. Burroughs in writing (by these affidavits or any other documents), that Laetrile has not been approved as a treatment or cure by the Food and Drug Administration of the United States Department of Health and Human Services. She also did not sign a written release, releasing him from any liability from the administration of Laetrile.[2]
15. During the October 7, 1980, visitation  after the affidavits were signed  respondent began treating her with metabolic therapy, consisting of Laetrile I.V., Vitamin C, B Vitamins, B-15, B-12, and crude liver injections. Metabolic therapy was commenced without obtaining her [Burroughs'] prior written consent.
16. Several days later, on October 13, 1980, respondent began treating her with small doses of chemotherapy in conjunction with the metabolic therapy. The chemotherapy treatment plan was based on a phone call to Dr. Donald Cole, a New York oncologist. Respondent described the type and extent of Ms. Burroughs cancer and Dr. Cole recommended small 100 milligram doses of 5-FU twice weekly, two to five milligrams of Laetrile twice weekly, and 50 milligrams of Cytoxin PO orally. Respondent administered this regimen until he discontinued chemotherapy at the end of November, 1980.
17. These doses and intervals of chemotherapy did not conform to the manufacturers' recommended doses contained in the Physician's Desk Reference, a standard reference used by practicing physicians. The doses administered by respondent were lower than those normally used in chemotherapy and are considered to be in the research or experimental stage.
18. Chemotherapy and metabolic therapy are incompatible  they work at cross-purposes. Chemotherapy drugs are strong immunosuppressants. They are toxic and intended to poison cancer cells; their effect is to suppress the body's immunological system. In contrast, the purpose of metabolic therapy is to enhance that same immunological system. For this reason, the use of chemotherapy is not included within the protocols for metabolic therapy found in International Protocols in Cancer Management. Respondent concedes that this publication is authoritative and contains the standard protocols for metabolic therapy.
19. Ms. Burroughs [sic] chemotherapy stopped at the end of November, 1980, but her metabolic therapy continued. By March, 1981, her right arm was beginning to swell because of enlarging lymph nodes. On the March 2, 1981, *332 office visit, respondent told her that Laetrile was not stopping the cancer, and discussed restarting chemotherapy. He increased her Vitamin C, and began administering herbal cleaners and botanical medicines containing red clover, chapparral, myrr, goldenseal, yellow dot, juniper berries, yuva, ursaberries, conch grass, and dandelion. Respondent categorizes these medicines as blood purifiers, lymph purifiers, liver cleaners, and kidney cleaners.
20. By June, 1981, respondent believed the cancer had metastasized to Ms. Burroughs' right lung. During office visits in early June, he rubbed herbal ointment or liniment, Vitamins E and F, into her rib cage area. He also prescribed herbal packs and poultices to cause localized hyperthermia (heat increase). He prescribed dark and yellow herbal salves and instructed her to apply them to her right breast and underarm area, explaining that they would draw out and break down the cancer tumor.
21. These salves  strong and painful  caused pieces of gray tissue to fall off her breast and underarm area. Respondent reacted by encouraging her, telling her that the salves were breaking down the cancerous tumor. He now admits, however, that the herbal ointments and salves would have been ineffective in treating the cancer which had metastasized to her lungs. He also prescribed a tea which tasted like black pepper. She forced herself to swallow it because he told her that it would break up the cancer in her body. This representation was also untrue.
22. In administering metabolic therapy to Ms. Burroughs, respondent also prescribed whole-body hyperthermia for the purpose of stimulating her immune system. This required her to totally submerge herself in bath water which was as hot as she could tolerate. According to the standardized protocols for metabolic therapy, as stated in International Protocols in Cancer Management, such "whole-body hyperthermia, while successful in some cases, is dangerous and considered experimental."
* * * * * *
24. Metabolic therapy is not approved or recognized as acceptable for cancer treatment by a respectable minority of the medical profession. This finding is based on the opinion of Alvin Edward Smith, M.D., board certified in oncology and internal medicine, and a Fellow of the American College of Physicians. He has treated cancer patients since 1978. His opinion on this issue is considered more credible than the contrary opinion of Rodrigo Rodriquez, M.D., who practices medicine in Tijuana, Mexico, who is not licensed to practice medicine in the United States, and who  other than acting as a guest resident at Kings County Hospital in Brooklyn, New York  has never practiced medicine in the United States.
Section 458.331(1), Florida Statutes (1979) empowers the Board of Medical Examiners to revoke, suspend or otherwise discipline a licensed medical doctor for:
(h) Failing to perform any statutory or legal obligation placed upon a licensed physician.
* * * * * *
(1) Making deceptive, untrue, or fraudulent representations in the practice of medicine or employing a trick or scheme in the practice of medicine when such scheme or trick fails to conform to the generally prevailing standards of treatment in the medical community.
* * * * * *
(t) Gross or repeated malpractice or the failure to practice medicine with that level of care, skill, and treatment which is recognized by a reasonably prudent similar physician as being acceptable under similar conditions and circumstances. The board shall give great weight to the provisions of s. 768.45 when enforcing this paragraph.
(u) Performing any procedure or prescribing any therapy which, by the prevailing standards of medical practice in *333 the community, would constitute experimentation on a human subject, without first obtaining full, informed, and written consent.
The hearing officer concluded that respondent had violated:
(a) Section 458.331(1)(h) by failing to inform Ms. Burroughs or Mr. Kirk, in writing, that Laetrile had not been approved as a treatment or cure by the Food and Drug Administration of the United States Department of Health and Human Services.
(b) Section 458.331(1)(l) by making false representations to Ms. Burroughs that the herbal tea and salves were breaking down her cancerous tumor.
(c) Section 458.333(1)(t) by failing to properly stage and treat Ms. Burroughs' disease, and by administering metabolic therapy "a form of cancer treatment not generally accepted by the medical profession" or by a respectable minority of the medical profession. See Baldor v. Rogers, 81 So.2d 658, (Fla. 1954). Additionally, the hearing officer concluded that respondent "deviated from the principles of metabolic therapy by simultaneously administering chemotherapy, and by prescribing whole body hyperthermia to Ms. Burroughs."
(d) Section 458.331(1)(u) by treating Ms. Burroughs with metabolic therapy  "a form of cancer treatment which is, at best, experimental in nature"  without first obtaining her written consent.
The record shows Clark failed to secure proper affidavits from Burroughs which would have ensured that the patient understood the experimental nature of her treatment. As well Clark was obligated to have Burroughs execute a release prior to administering Laetrile. Although this would have principally served Clark's own interest and would hardly by itself be a basis for the harsh disciplinary action taken here, it reflects Clark's failure to properly inform his patient about the nature of the treatment she was receiving. Clark also led Burroughs to the erroneous belief that the salves and ointments she was applying topically were ridding her body of the cancer. There appears to have been a pattern of misrepresentations with regard to the treatment and such intentional conduct violates the professional standards to which all physicians must ascribe.
Thus, the record supports the findings of statutory violations. In sum, the respondent was found to have misrepresented his treatment to the patient, to have experimented upon her without telling her that the treatment was experimental and obtaining her written informed consent and to have failed to observe the statutory requirements regarding the use of Laetrile. Contrary to respondent's assertion, the statute does not prohibit a patient from requesting or receiving Laetrile, nor does it prohibit the prescribing or administering of Laetrile by a physician for a patient. Rather, the statute places certain well-defined legal obligations on the physician in administering this drug.
One additional issue warrants discussion. The hearing officer recommended that appellant's medical license be suspended for one year. In reviewing the findings, the Board of Medical Examiners is bound by the findings of fact of a hearing officer so long as competent substantial evidence supports those findings. See Johnston v. Dept. of Professional Regulation, 456 So.2d 939 (Fla. 1st DCA 1984). Upon objections filed to this recommendation, the Board of Medical Examiners rejected the proposed penalty as inappropriate under the circumstances and ordered that appellant's medical license be revoked. This penalty is within the authority granted to the Board of Medical Examiners by section 458.331 for violations of that statute. While we might view that penalty as harsh, we are not charged with the responsibility for the administration of the practice of medicine as is the Board, and so long as the penalty imposed is within the permissible range of statutory law, this court has no authority to review the penalty unless the agency findings are in part reversed.[3] *334 Florida Real Estate Commission v. Webb, 367 So.2d 201 (Fla. 1978). Because we have not reversed any of the findings, we may not review the penalty. Section 120.68(12), Florida Statutes (1983).
This decision is not, and should not be considered as a criticism of metabolic therapy or of any other treatment for cancer. It is certainly not within our field of expertise to criticize any treatment for a disease which so far has defied the efforts of the best minds available to find a cure. The medical testimony reveals, as does our common knowledge, that despite the considerable advances which have been made by medical science in combatting this dread disease, there remains a category of patients for whom, because of the advanced stage of their illness, surgery, radiation and chemotherapy can offer little hope. The legislature and the courts have been sensitive to the desires of such persons to exhaust all potential avenues of treatment, even those not generally recognized as effective. We have not been called upon here to evaluate the effectiveness of metabolic or holistic forms of therapy, and we make no such evaluation. We are called upon only to determine if there was sufficient evidence to support the action taken by the Board of Medical Examiners for the specific transgressions which were found to exist here. We find that there was such evidence, and so the order appealed from is
AFFIRMED.
COBB, C.J., concurs.
FRANK D. UPCHURCH, Jr., J., concurs in part, dissents in part, with opinion.
FRANK D. UPCHURCH, Jr., Judge, concurring in part, dissenting in part.
I concur with the majority opinion that competent substantial evidence exists that Dr. Clark violated sections 458.331(1)(h), (l), (t) and (u), but would remand for reconsideration of the penalty imposed. I believe the penalty imposed should not be sustained for the following reasons.
Section 458.331(1) contains numerous grounds for which disciplinary action may be taken against a licensed physician. Section 458.331(2) provides:
When the Board finds any person guilty of any of the grounds set forth in subsection (1), it may enter an order imposing one or more of the following penalties:
(a) Refusal to certify to the Department an application for licensure.
(b) Revocation or suspension of a license.
(c) Restriction of practice.
(d) Imposition of an administrative fine not to exceed $1,000 for each count or separate offense.
(e) Issuance of a reprimand.
(f) Placement of the physician on probation for a period of time and subject to such conditions as the board may specify, including, but not limited to, requiring the physician to submit to treatment, to attend continuing education courses, to submit to reexamination, or to work under the supervision of another physician.
In an apparent effort to ensure that the punishment fit the particular violation and that some degree of uniformity in treatment exist among violators, the legislature added in section 458.331(4) that:
The board shall by rule establish guidelines for the disposition of disciplinary cases involving specific types of violations. Such guidelines may include minimum and maximum fines, periods of supervision *335 or probation, or conditions of probation or reissuance of a license.
The Board has adopted "guidelines" for disciplinary actions brought pursuant to Chapters 455 and 458, Florida Statutes in Ch. 21M-20, Florida Administrative Code. Rule 21M-20.01 provides:
(1) For violations of Section 455.221(1)(a), Sections 458.331(1)(d), 458.331(1)(e), 458.331(1)(f), 458.331(1)(o), 458.331(1)(p), 458.331(1)(aa) and 458.331(1)(bb), F.S. (1979), the Board may impose one or more of the following penalties:
(a) refusal to certify to the Department an application for licensure;
(b) suspension of the physician's license up to five (5) years;
(c) restriction of practice up to five (5) years;
(d) imposition of an administrative fine not to exceed $1,000 for each count or separate offense;
(e) issuance of a reprimand.
(2) For violation of Sections 455.227(1)(b), 455.227(1)(c), 455.227(1)(d), 455.227(1)(e), Section 458.013 or Sections 458.227(1)(a), 458.227(1)(b), 458.227(1)(c), 458.227(1)(g), 458.227(h), 458.227(1)(i), 458.227(1)(j), 458.227(1)(k), 458.227(1)(l), 458.227(1)(m), 458.227(1)(n), 458.227(1)(q), 458.227(1)(r), 458.227(1)(s), 458.227(1)(t), 458.227(1)(u), 458.227(1)(v), 458.227(1)(w), 458.227(1)(x), 458.227(1)(y), 458.227(1)(z), Florida Statutes (1979),[[1]] the Board may impose one or more of the following:
(a) refusal to certify to the Department an application for licensure;
(b) Revocation or suspension of a license;
(c) restriction of practice;
(d) imposition of administrative fine not to exceed $1,000 for each count or separate offense;
(e) issuance of a reprimand;
(f) placing the physician on probation for a period of time subject to such conditions as the Board may specify, including, but not limited to, requiring the physician to submit to treatment, to attend continuing education courses, to submit to reexamination, and to work under the supervision of another physician.
(3) The Board may take into consideration the following factors in determining the appropriate disciplinary action to be imposed:
(a) the severity of the offense;
(b) the danger to the public;
(c) the number of specific offenses;
(d) the length of time since the date of the violation(s);
(e) the length of time the licensee has practiced his profession;
(f) the actual damage, physical or otherwise, to specific patients;
(g) prior discipline imposed upon the licensee;
(h) the deterrent effect of the penalty imposed;
(i) the effect of the penalty upon the licensee;
(j) efforts by the licensee towards rehabilitation; and
(k) any other mitigating or aggravating circumstances.
The data base derived from the cases arising from medical license suspension or revocation is insufficient to furnish a basis for a conclusion as to whether the Board has achieved any degree of uniformity in the imposition of penalties. The types of infraction are as dissimilar as the penalties. For example:
1. Probation imposed for inappropriately prescribing controlled substances. Johnston v. Department of Professional Regulation, Board of Medical Examiners, 456 So.2d 939 (Fla. 1st DCA 1984).
2. One year suspension and five years probation for falsification of application for admission to practice, injection of drugs in *336 an attempt to commit suicide, and an inability to practice medicine by reason of the use of narcotics and mental illness. Maskaron v. Department of Professional Regulation, Board of Medical Examiners, 450 So.2d 1242 (Fla. 2d DCA 1984).
3. Suspension for violation of Sections 458.331(1)(t) and 458.331(1)(q) relating to failure to practice medicine with that level of care, skill, and treatment recognized by a reasonably prudent similar physician and inappropriate prescribing of controlled substances. Scheininger v. Department of Professional Regulation, Board of Medical Examiners, 443 So.2d 387 (Fla. 1st DCA 1983).
4. Three months suspension and five years probation for twenty-two counts of violation of the Medical Practice Act and the Comprehensive Drug Abuse Prevention Control Act. Hodge v. Department of Professional Regulation, Board of Medical Examiners, 432 So.2d 117 (Fla. 5th DCA 1983).
5. Revocation for exploitative sexual relations with a twenty-two year old female patient. Solloway v. Department of Professional Regulation, Board of Medical Examiners, 421 So.2d 573 (Fla. 3d DCA 1982).
Undoubtedly the Board does and should consider some offenses more reprehensible than others. However, the "guidelines" which the Board has adopted give no guidance to the profession, to the hearing examiners who recommend penalties, or to the Board itself.
By enacting Section 458.331(4) the Legislature sought to avoid a completely arbitrary imposition of penalties. The Board contends however that under the supreme court's holding in Florida Real Estate Commission v. Webb, 367 So.2d 201 (Fla. 1978), so long as the agency imposes a penalty prescribed by law it has acted within the range of its discretion and a reviewing court cannot overturn it unless the agency's finding is at least in part reversed. That case, however, is inappropriate because the legislature did not mandate the adoption of guidelines in disciplining real estate licensees, apparently recognizing that the range of violations would not be as varied and diverse as those anticipated in the medical field. The construction of effective guidelines, I concede, is a complex matter which the legislature recognized in delegating the task to the Board. The Board, in my opinion, has done little more than paraphrase the penalties authorized by the statute and while it listed certain factors to be considered, the rule is silent as to how those factors are to be weighed or applied. It is obvious that neither the Board nor the examiner is following or considering these guidelines. The examiner does not explain why he recommended a one year suspension, and the Board gives no explanation as to why it deemed the recommended penalty inappropriate.
The penalty, after reviewing the cases listed above, seems unusually harsh. Because the "guidelines" give us no guidance, however, I cannot say the penalty is unduly harsh.
I would reverse and remand for reconsideration of the penalty after adoption of effective guidelines and application of those guidelines in accordance with the legislative mandate of section 458.331(4).
NOTES
[1] Patient Kirk was terminally ill and had a history of choriocarcinoma of the larynx. The only allegation of wrongdoing with regard to Kirk was Clark's failure to obtain the affidavits required by Florida Statute § 458.333 and 458.331(1)(a), discussed in detail infra.
[2] Clark's obligations with regard to administering Laetrile are detailed in section 458.333, Florida Statutes (1979):

Prescription or administration of amygdalin (laetrile); disciplinary action; signed release by patient.
(1) As used in this section, unless the context clearly requires otherwise, "physician" means a doctor of medicine or osteopathic medicine licensed under this chapter or chapter 459.
(2) No physician shall be subject to disciplinary action by the Board of Medical Examiners or Board of Osteopathic Medical Examiners for prescribing or administering amygdalin (laetrile) to a patient under his care who has requested the substance unless the Boards of Medical Examiners and Osteopathic Medical Examiners, in a hearing conducted under the provisions of the Administrative Procedure Act, chapter 120, have made a formal finding that the substance is harmful.
(3) The patient, after being fully informed as to alternative methods of treatment and their potential for cure, and upon requesting the administration of amygdalin (laetrile) by his physician, shall sign a written release, releasing the physician and, when applicable, the hospital or health facility from any liability therefor.
(4) The physician shall inform the patient in writing that amygdalin (laetrile) has not been approved as a treatment or cure by the Food and Drug Administration of the United States Department of Health and Human Services.
[3] We do not address the concern expressed by the concurring/dissenting opinion that Ch. 21M-20, Florida Administrative Code, does little more than paraphrase Chapters 455 and 458, Florida Statutes, and fails to indicate the weight to be accorded factors considered in physician licensing proceedings. The appellant neither raised this question below, nor presented it for our consideration on appeal. An appellate court should review only those alleged errors properly presented to it, Foley v. State ex rel. Gordon, 50 So.2d 179 (Fla. 1951), and only those issues presented to and ruled on by the lower tribunal. Dober v. Worrell, 401 So.2d 1322 (Fla. 1981). See also, In the Interest of K.A.F., 442 So.2d 365 (Fla. 5th DCA 1983); Hegeman-Harris Co., Inc. v. All State Pipe Supply Co., Inc., 400 So.2d 1245 (Fla. 5th DCA), review dismissed, 411 So.2d 380 (Fla. 1981).
[1] There is no § 458.227 in the Florida Statutes and it is obviously a misprint in the Florida Administrative Code. It should read § 458.331 as in subsection (1) of the Rule.