554 So.2d 516 (1989)
Terri J. GANSON, Appellant,
v.
STATE of Florida, DEPARTMENT OF ADMINISTRATION, OFFICE OF STATE EMPLOYEES' INSURANCE, Appellee.
No. 88-1568.
District Court of Appeal of Florida, First District.
July 7, 1989.
Kenneth D. Kranz of Eric B. Tilton, P.A., Tallahassee, for appellant.
Augustus D. Aikens, Jr., Gen. Counsel, Dept. of Admin., Tallahassee, for appellee.
BARFIELD, Judge.
In this appeal from a final order of the Department of Administration denying a claim for health insurance benefits, appellant asserts that the Department improperly rejected the hearing officer's recommended findings of fact and arbitrarily interpreted the provisions of the State Group Health Insurance Plan in a manner contrary to its plain meaning and to established insurance law. We agree and reverse.
Appellant was treated for situational depression prior to her employment by the State in January 1986 and her enrollment in the State Group Health Insurance Plan, which is administered by the Department of Administration pursuant to section 110.123, Florida Statutes (1987), and chapter 22K-1, Florida Administrative Code.[1] Three months after enrollment in the Plan, she was hospitalized, diagnosed and treated for manic depressive illness, now known as "bipolar affective disorder."[2] The Department denied her claim for reimbursement under the Plan for the first year of enrollment on the ground that her illness was a pre-existing condition, notwithstanding that her physician (Dr. Shamis), her psychologist (Dr. Whitley) and the psychiatrist who hospitalized her and diagnosed bipolar affective disorder (Dr. Munasifi) had informed Blue Cross/Blue Shield that she had not been treated for bipolar affective disorder before April 1986.
*517 The State Group Health Insurance Plan Benefit Document, created and maintained by the Department and approved by the legislature, defines the coverage conditions, limitations and exclusions of the Plan. The "pre-existing condition" exclusion specifies:
For any accident or illness for which an insured received diagnostic treatment or received services within three-hundred and sixty-five (365) consecutive days prior to the effective date of coverage, no payment will be allowed for services related to such accident or illness which are received during the three hundred and sixty-five (365) consecutive days subsequent to the effective date of coverage; however, covered services related to such accident or illness which are received after three hundred and sixty-five (365) consecutive days of coverage are covered by the Plan.
The Benefit Document defines "illness" as "physical sickness or disease, pregnancy, bodily injury, congenital anomaly or mental or nervous disorder."
Appellant timely requested a 120.57 hearing and in the pre-hearing stipulation the parties agreed that she is entitled to reimbursement for the amount stipulated if the condition for which services were rendered did not constitute a pre-existing condition, i.e., an "accident or illness" for which she "received diagnostic treatment or received services within three hundred and sixty-five days prior to ..." her enrollment in the plan.
At the hearing before Michael Parrish, the Department of Administrative Hearings hearing officer, appellant testified that she had been treated since 1983 by Dr. Whitley for depression caused by events in her life, but that her March 1986 depression was uncontrollable and she was suicidal. She "got hyper" at Whitley's office and Dr. Shamis referred her to Dr. Munasifi, who hospitalized her and diagnosed bipolar affective disorder. She testified that she has no family or personal history of bipolar affective disorder, never before felt manic or depressed for no reason and never before had that kind of "high". She stated that she had never before been treated with lithium, but now takes lithium twice a day and has had no more manic episodes. She still gets depressed, but it is controllable now, and she still sees Dr. Whitley once a week.
Dr. Whitley testified that he had treated appellant before March 1986 for "situational depression" which he described as temporary depressions caused by events in her life. He stated there was no identifiable stimulus for her March 1986 depression and the symptoms (intense mood swings, suicidal ideation, inability to control her thoughts) had not been exhibited before. Dr. Shamis' anti-depressant prescriptions (Mellaril and Cogentin) escalated the symptoms and were discontinued after two days.
Dr. Whitley testified that he is familiar with bipolar affective disorder to a limited extent and suspected it might be the cause of appellant's symptoms, and that the disorder is not a progression or severe case of situational depression, but is caused by a chemical imbalance. The treatment is with lithium (to correct the chemical imbalance) and counseling (to help the patient accept the fact of the condition and the continued need for lithium treatment). Before her hospitalization, Whitley's counseling had been to help appellant deal with the situation or event causing the particular depression; she had never before described manic periods or uncontrollable depression.
William Seaton, a benefits analyst with the Office of State Employees' Insurance who has no training in psychology or psychiatry, testified that the purpose of the pre-existing condition exclusion was to "prevent adverse selection against the Plan." He testified the Plan's position was that if the insured had been treated for any "nervous or mental condition" within the year prior to enrollment, she is not covered for any nervous or mental condition for one year after enrollment. He stated that the same was not true for any physical disease, and that this is how the Plan has always been interpreted, but admitted that there was no basis in the Plan for the different exclusion interpretations for physical and mental illnesses.
*518 The hearing officer also considered the relevant portions of the Benefit Document, the doctors' letters, the level II review (by a nurse) and the level III review (by a doctor) of the claim,[3] the letter formally denying the claim, and correspondence between the hospital and Blue Cross over whether the condition was pre-existing, including a memo from Blue Cross stating that "regardless of diagnosis, any mental and nervous condition is pre-existing on the above patient."
In a post-hearing deposition, Dr. Munasifi was accepted as an expert in the diagnosis and treatment of bipolar affective disorder and testified that before he saw her in April 1986, appellant had been treated for situational depression and major depressive episodes, but had never been diagnosed or treated for bipolar affective disorder. He stated that bipolar affective disorder is not the same condition as her prior depressions, nor is it a progressive condition, nor is it an acute form of those conditions.
Dr. Munasifi testified that bipolar affective disorder is caused by a chemical imbalance and is usually diagnosed by psychiatrists; depression is one of its manifestations, and response to the lithium confirms the diagnosis. He stated that appellant's April 1986 depression was more severe than the earlier depressions and had manic elements, and that the insurer never consulted him nor requested appellant's medical records.
In his recommended order, the hearing officer found that prior to her enrollment in the Plan, appellant had been diagnosed as having situational depression for which she had received treatment, but that she had not been diagnosed or treated for bipolar affective disorder, which "is believed to be caused by a deregulation of the chemical neurotransmitters in the brain." He found that the primary treatment for bipolar affective disorder is lithium carbonate, which is specific for this disorder and is the main difference between treatment for bipolar affective disorder and the treatment appellant received prior to her enrollment in the Plan. He noted that behavioral therapy may also be useful in the treatment of the symptoms of bipolar affective disorder, as it is in the treatment of the symptoms of other conditions which cause depression.
The hearing officer found that situational depression and bipolar affective disorder are separate and distinct conditions, that the former is not an earlier stage of the latter, and that the fact that both conditions have certain common symptoms (periods of depression) does not mean that they are the same condition. He concluded that because bipolar affective disorder is not the same condition as situational depression, it was not a pre-existing condition within the meaning of the benefit exclusion, and recommended that appellant be reimbursed in the stipulated amount. No exceptions to the recommended order were submitted by either party.
In the final order, based on the stipulations of the parties, the testimony and exhibits "and recommended findings of the hearing officer," Adis M. Vila, Secretary of the Department of Administration, found that prior to enrollment in the Plan, appellant had been treated for conditions which fall under the "broad mental or nervous disorder of depression," but that the specific characterization of bipolar affective disorder "was not and could not have been made" until her April 1986 hospitalization, because appellant's psychologist "was not trained in diagnosing the disorder" and she did not see a psychiatrist, who is generally able to diagnose bipolar affective disorder, until then.[4] Vila found that neither doctor *519 observed any of appellant's "transient mild episodes of hyperactivity."[5] She observed that lithium carbonate is an antidepressant drug used to treat various depressive illnesses and found, based on Dr. Munasifi's testimony, that appellant's treatment with lithium carbonate did not establish that she is suffering from a "different" mental or nervous disorder.[6]
Vila found situational depression and bipolar affective disorder to be "separate conditions under the same mental or nervous disorder (depression) which is and was treatable in the same general manner" and determined that the pre-existing condition exclusion applied, based on Dr. Munasifi's inability to say that appellant "first contacted (sic) bipolar affective disorder in April 1986,"[7] the fact that patients with bipolar affective disorder and those with situational depression "may also display some or all of the same symptoms,"[8] the fact that "the treatment for each disorder includes antidepressant drugs and therapy,"[9] and the fact that appellant had received antidepressant drugs and therapy for depression within one year prior to enrollment.[10]
In her "Conclusions of Law," Vila found that "depression is depression," quoting Dr. Munasifi,[11] and that appellant's depression was a mental or nervous disorder under the Plan, falling into the "second category" of mental disorders ("more likely to be the result of the individual's inability to adapt to his environment"), as opposed to the "first category" ("disorders marked by a basic or primary impairment or (sic) brain function generally associated with brain disease").[12] Vila concluded that appellant was not entitled to any reimbursement for expenses incurred during her first year of enrollment.
Appellant correctly contends that the Department violated section 120.57(1)(b)10, Florida Statutes, which requires that when an agency rejects or modifies a hearing officer's findings of fact, it must state with particularity in the final order that the findings of fact were not based upon competent substantial evidence or that the proceedings did not comply with the essential *520 requirements of law. We find that the hearing officer's findings of fact were supported by competent substantial evidence, and were therefore not subject to modification by the Department.
Appellant argues that the Department has interpreted the controlling provisions of the Benefit Document in a manner which applies the pre-existing condition exclusion differently depending upon whether the person had a "mental or nervous disorder" or a "physical sickness", and that such a selective interpretation clearly works to the detriment of persons suffering from mental or nervous disorders. She notes that the Department can point to no authority for this discriminatory treatment, and argues that the Department's interpretation is contrary to the plain meaning of the words in the Benefit Document (which provide no distinction between "mental or nervous disorders" and "physical sickness") and to established insurance law (which requires that any ambiguity in an insurance contract be construed in favor of the insured, rather than the insurer).
The Department contends that it has developed a special expertise in "balancing the determined levels of benefits with contributions and claim experience," and that from this expertise it has established policies for administration of the Plan, set out in its Benefit Document. It asserts that its interpretation of the unambiguous "pre-existing condition" exclusion achieves the intended purpose of this policy: If an insured has been diagnosed or treated for any mental condition prior to enrollment in the plan, the plan excludes coverage for any mental or nervous condition for one year subsequent to her enrollment.
The Department asserts that "mental or nervous disorder" is an all-encompassing term which includes various mental or nervous "conditions". It argues that the problems presented by mental and nervous disorders are different from the problems presented by physical sickness or disease, pregnancy, bodily injury, or congenital anomaly, and that the agency is accordingly free to recognize these unique problems in its Benefit Document. It asserts that its interpretation and the language of the Benefit Document lead to the "inescapable conclusion" that appellant had a pre-existing mental or nervous disorder. It contends that the hearing officer's recommended order did not address this policy interpretation of the Benefit Document and by implication overturned it, that his findings were infused with his own policy considerations and were inconsistent with the clear language of the Benefit Document, and that its substituted findings of fact were supported by competent substantial evidence.
The language of the Benefit Document contains no indication that mental or nervous disorders are to be evaluated in a different manner from physical illnesses or conditions. Neither does it contain any statement of policy or other indication of a basis for the interpretation to which Seaton testified. When, as here, an agency does not choose to document its policy by rule, there must be adequate support for its decision in the record of the proceeding. Florida Cities Water Co. v. Florida Public Service Commission, 384 So.2d 1280 (Fla. 1980).
In such an administrative order, "the accuracy of every factual premise and the rationality of every policy choice which is identifiable and reasonably debatable must be shown by some kind of evidence undergirding the order which makes that policy choice on that factual premise." Anheuser-Busch, Inc. v. Department of Business Regulation, 393 So.2d 1177, 1182 (Fla. 1st DCA 1981). In other words, the agency must create a record foundation for the policy decisions in its orders, by expert testimony, documentary opinion or other evidence appropriate in form to the nature of the issues involved. Id. at 1183.
Seaton's statement of the Department's policy of interpreting the "pre-existing condition" exclusion differently for mental disorders as compared to other "illnesses" is not supported by a sufficient record foundation. Vila rejected the hearing officer's factual findings, which were supported by competent substantial evidence, and substituted her own findings, which were for the most part not supported *521 by the record. The determination of whether situational depression is the same mental disorder as bipolar affective disorder is susceptible of ordinary proof, using expert witnesses, and does not require any particular agency expertise.[13]
The interpretation of the unambiguous "pre-existing condition" exclusion of the Benefit Document, the "insurance contract" in this case, is a question of law.[14] The hearing officer impliedly rejected Seaton's interpretation of the exclusion as unreasonable. The agency's strained "policy" interpretation is not supported by the language of the Benefit Document or by any other evidence in the record.[15]
The final order of the Department is REVERSED and the case is REMANDED *522 to the Department for further proceedings consistent with this opinion.
Appellant's motion for attorney fees under section 120.57(1)(b)10, Florida Statutes (1987), based upon her assertion that the agency action which precipitated the appeal was a gross abuse of the agency's discretion, is granted.[16] The parties may, within twenty days of the date this decision becomes final, file with this court a stipulation regarding the amount of reasonable attorney fees to be awarded. In the event the amount of the attorney fees cannot be agreed upon by the parties within the time allotted, the Department shall promptly refer the matter to Michael Parrish, the Department of Administrative Hearings hearing officer, for an immediate evidentiary hearing to determine the amount of reasonable attorney fees. The hearing officer's recommendations thereon shall be filed with this court within sixty days after this opinion shall have become final, at which time this court will enter an appropriate order awarding attorney's fees. Purvis v. Department of Professional Regulation, 461 So.2d 134 (Fla. 1st DCA 1984); Johnston v. Department of Professional Regulation, 456 So.2d 939 (Fla. 1st DCA 1984).
SHIVERS, C.J., and ZEHMER, J., concur.
NOTES
[1] Blue Cross/Blue Shield administers the Plan for the Department.
[2] The parties stipulate she has incurred $55,682.15 in medical expenses for the hospitalization and subsequent treatment.
[3] The level III review noted that there were "essentially no medical records for review in this file" but that the level II review had listed the diagnoses for which appellant was treated "in the 12 months prior to effective date" which included "296.8 Manic depressive psychosis." The doctor concluded that if the list was correct, appellant's April 1986 hospitalization "was for a pre-existing condition: namely, depression" and that this is the "biochemical disorder" referred to in her doctors' letters. Seaton did not know whether either reviewer had any psychiatric training, and was not sure where the nurse obtained the information in the level II review.
[4] The "pre-existing condition" exclusion does not depend on whether the insured was, prior to enrollment, in fact suffering from a condition which was not diagnosed, but whether the insured had been diagnosed or treated for the condition for which she now seeks reimbursement.
[5] Appellant testified that she had one of the manic episodes in Dr. Whitley's presence, which prompted him to call Dr. Shamis and eventually resulted in her hospitalization. Dr. Munasifi testified that he had not personally witnessed any manic episode.
[6] Although Dr. Munasifi testified that lithium carbonate is sometimes used in the treatment of other disorders, he also found that appellant's response to lithium, in combination with her symptoms, indicated she was suffering from bipolar affective disorder, and that this is different from situational depression.
[7] Dr. Munasifi testified that bipolar affective disorder can develop over a period of weeks or months, or even overnight. However, the exact moment when appellant actually developed the chemical imbalance that led to her March 1986 symptoms is irrelevant in view of the language of the "pre-existing condition" exclusion, which refers to diagnosis or treatment.
[8] Neither doctor testified that the symptoms of the two disorders are identical, but only that they often share a common symptom, depression.
[9] While this statement is technically correct, the doctors testified that one of the indications that appellant was suffering bipolar affective disorder instead of her usual situational depressions was that the normal antidepressants used to treat the latter disorder only exacerbated the situation and that lithium, the drug usually used to treat bipolar affective disorder, relieved appellant's symptoms. Dr. Whitley testified that although he was still counseling appellant, the counseling for bipolar affective disorder has a different focus from the counseling she received for situational depression.
[10] See footnote 9. The gist of the doctors' testimony was that appellant displayed the symptoms of and was treated for situational depression prior to March 1986, and that after that time she displayed the symptoms of and was treated for bipolar affective disorder, a different condition.
[11] This quotation is taken out of context, since the tenor of Dr. Munasifi's testimony is that bipolar affective disorder is a different condition from situational depression, with a different underlying cause, i.e., a chemical imbalance.
[12] These definitions apparently came from Schmit's Attorney's Dictionary of Medicine, 1986. The record before the hearing officer contains no mention of this source or these definitions.
[13] In Johnston v. Department of Professional Regulation, Board of Medical Examiners, 456 So.2d 939, 943 (Fla. 1st DCA 1984), this court reversed an agency order based upon the Board's substituted findings of fact, noting that the circumstances "do not present a unique question that is not susceptible of ordinary methods of proof, resolution of which falls within the special expertise of the board to the point that the board may overturn the findings of the hearing officer when those findings are based upon competent substantial evidence in the record." The court observed that even when an agency is justified in substituting its own findings of fact, the reviewing court must consider the substantiality of the evidence supporting the agency's substituted findings, and that neither the transcript of the board meeting nor the final order "sets forth a reasonable basis in the form of articulation of the underlying medical reasons for invocation of the board's special insight and expertise." Id. at 944.

In Purvis v. Department of Professional Regulation, Board of Veterinary Medicine, 461 So.2d 134, 136 (Fla. 1st DCA 1984), this court rejected the agency's substituted finding of fact, in support of which the Board had argued, "consideration of the ultimate facts in this matter were less questions of witness credibility or factual issues susceptible of ordinary methods of proof, and more subjects which the Board may rightfully claim very special insights." The court found that the Board had failed to state with particularity any reasons for rejecting the hearing officer's finding that "there was no evidence that Dr. Purvis's care fell below the standard of care for veterinarians in the community," which it found was a correct statement supported by the record, and that it was error "for the Board to substitute its own finding of deviation from a standard of conduct known only to them which had not been proven in the record." Id. at 137. In Harac v. Department of Professional Regulation, Board of Architecture, 484 So.2d 1333 (Fla. 3d DCA 1986), the court rejected the "special expertise" argument and ruled that the agency could not substitute its judgment for that of the hearing officer in determining Harac to be qualified for registration. The court noted that the design competency of an architectural license applicant, while requiring specialized knowledge and experience, "is not so unique so as to defy ordinary methods of proof in formal adversarial proceedings," and that the hearing officer had correctly selected one expert witness' opinion over another on the basis of the examiner's conformity to the grading rules set by the Department.
See also Cohn v. Department of Professional Regulation, 477 So.2d 1039, 1047 (Fla. 3d DCA 1985), which involved revocation of a pharmacists's license, the court ruled the Board of Pharmacy should have remanded to the hearing officer to supply a missing finding of fact, noting that "there is no authority for any agency to make an independent determination of disputed fact in a review proceeding like this under any circumstances; it may only consider whether findings actually made are sustained by the evidence ... and whether, if so, they support the recommended conclusions."
[14] In Neumann v. Brigman, 475 So.2d 1247 (Fla. 2d DCA 1985), cited by the Department, the court held that where the contract language is clear and unambiguous, it is up to the court to interpret the contract as a matter of law, but that where the provisions of the contract are ambiguous, the ambiguity must be resolved by the trier of fact.
[15] In Gar-Con Development, Inc. v. State, Department of Environmental Regulation, 468 So.2d 413 (Fla. 1st DCA), rev. den., Department of Environmental Regulation v. Gar-Con Development, Inc., 479 So.2d 117 (Fla. 1985), this court held that the agency's "policy" of defining pile driving as dredging was not the type of policy that can be developed on a case-by-case basis, but is one of general applicability affecting substantial rights of persons, and as such, was required to be promulgated as a rule. It found that the "policy" was contrary to the agency's validly enacted rule definition of "dredging" and was not a reasonable and permissible interpretation of the word, and held that absent a validly enacted rule, the agency could not deny a permit to construct docks based on that "policy" definition.

By contrast, in City of Clearwater (Fire Department) v. Lewis, 404 So.2d 1156 (Fla. 2d DCA 1981), the court found that the agency's policy, that a public employee has a right to union representation at an interview in which he is given the option to resign or be fired, had a reasonable basis "consistent with the philosophy of chapter 447."
[16] In Doctors' Osteopathic Medical Center, Inc. v. Department of Health and Rehabilitative Services, 498 So.2d 478 (Fla. 1st DCA 1986), the court found that the agency statement that it had articulated its non-rule policy in the record did not support its rejection of the hearing officer's finding of need in a certificate of need proceeding, and that under the totality of the circumstances, the agency's conduct was sufficiently egregious to reach the level of "gross abuse". The court stated that even where policy considerations are involved, "it is the agency's duty to explain its policies and to address countervailing arguments developed in the record as well as those urged by the hearing officer's recommended order." 498 So.2d at 480.