## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CC-01410-SCT

*JOHN WILBUR McFADDEN, JR., M. D.*

*v.*

*MISSISSIPPI STATE BOARD OF MEDICAL LICENSURE*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/1997 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ALEX A. ALSTON, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: EDWIN THARP COFER |
| | MISSISSIPPI STATE BOARD OF MEDICAL LICENSURE |
| | BY: STAN INGRAM |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 02/04/99 |
| MOTION FOR REHEARING FILED: | 2/17/99 |
| MANDATE ISSUED: | 4/22/99 |

**BEFORE SULLIVAN, P.J., McRAE AND ROBERTS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. This is an appeal from the October 14, 1997, judgment of the Hinds County Chancery Court affirming the November 22, 1996, decision of the Mississippi Board of Medical Licensure suspending Dr. McFadden's medical license indefinitely but automatically staying the suspension subject to numerous probationary conditions that severely restrict, or in some circumstances, prohibit his privileges to prescribe controlled substances.

### STATEMENT OF THE FACTS

1. Dr. McFadden

¶2. Dr. McFadden is a physician licensed to practice medicine in the State of Mississippi, currently holding License No. 05129. Dr. McFadden considers himself a specialist in the treatment of severe, chronic pain. He is a founding member of the Southern Pain Society and the American Academy of Pain Medicine. Dr. McFadden has written on the treatment of pain and has lectured in the United States and abroad on the subject.

### 2. Records Seized

¶3. In March 1996, investigators with the Board of Medical Licensure visited Dr. McFadden's clinic in Tupelo, Mississippi, in order to execute an administrative inspection and search warrant.. The search warrant, obtained pursuant to the Uniform Controlled Substances Act, Miss. Code Ann. § 41-29-101 *et seq*., permitted the investigators to obtain and review the medical records of selected patients under Dr. McFadden's care. Following routine prescription profiles of pharmacies in the Tupelo area, thirty six patients had been identified as receiving usually large quantities of controlled substances through prescriptions issued by Dr. McFadden. The investigator presented four of these patient files to the Board for review at the November 21 and 22, 1996 hearing on this matter. The patient files presented were those of Dwight Kee, Priscilla Lovelace, Jeffrey Gilmore, and Jackie Tate.

### 3. Background Facts

¶4. In its affidavit for the administrative inspection and search warrant, the Board asserted the following underlying facts establish probable cause for the March 1996 search and seizure of Dr. McFadden's patient files:

a. In March 1997, Dr. McFadden was investigated by the Board for issuing suspicious amounts of prescriptions for Codeine based products and diet pills.

b. In June 1987, he was investigated for excessive purchases of Schedule III controlled substances and issued a Letter of Admonition by the United States Drug Enforcement Administration (DEA) for numerous violations of state and federal controlled substance law.[1]

c. In February, 1989, the Board received a complaint from the Amory, Mississippi Police Department concerning Dr. McFadden prescribing large quantities of Propoxyphene to known drug abusers in the Amory area.

d. In December 1991, pharmacy profiling by the Board documented suspicious quantities of Codeine, Hydrocodone and Propoxyphene prescriptions being issued by Dr. McFadden to patients in the Tupelo area. Many of these patients were suspected or known drug abusers.

e. In April 1992, investigators performed a review of selected patient files identified as receiving suspicious quantities of controlled substances prescriptions from Dr. McFadden. Seven patient medical files were reviewed. All patients were identified as having some type of drug use/abuse. Several patients were noted as receiving suspicious amounts of controlled substances for long periods of time. In addition, many of the prescriptions issued were not properly documented in the charts. Investigators also conducted a follow-up inspection to an audit and inspection performed by the Board and the DEA in 1988. As a result of this visit, the Board's previous Executive Officer Frank J. Morgan, Jr., M.D., contacted Dr. McFadden in writing warning him to properly document patient records and monitor patients who exhibit symptoms of chemical dependency. The letter also warned

Dr. McFadden that his prescribing habits would continue to be monitored by the Board.

f. In April 1995, the Board was contacted by a member of the Lee County Sheriff's Department concerning Dr. McFadden issuing narcotic prescriptions to known drug abusers.

g. Also in April 1995, the Board was contacted by the Tupelo Police Department concerning a possible diversion of controlled substance samples from Dr. McFadden's clinic. Dr. McFadden was described as reluctant to cooperate with the police officers in their investigation of the theft.

### 4. The Complaint

¶5. The current charges against Dr. McFadden are set forth in an 11-count affidavit or complaint. Specifically, the Board charges Dr. McFadden with (1) failing to maintain complete records of examination, evaluation, and treatment of patients, including the alleged failure to document a diagnosis that would justify prescribing controlled substances; (2) prescribing controlled substances without a good faith examination of the patients; (3) prescribing addictive medications "otherwise than in the course of legitimate professional practice"; and (4) unprofessional conduct, including "conduct likely to deceive, defraud or harm the public."

### 5. The Board Hearing

¶6. On November 21 and 22, 1996, Dr. McFadden appeared before the Board. The Board's witnesses included the investigator, Mr. Thomas Washington, and a neurosurgeon, Dr. Bernard Patrick. After counsel for the Board rested, Dr. McFadden moved for a directed verdict, but his motion was denied. Dr. McFadden's witnesses included Dr. McFadden, Dr. George McGee, Dr. David McKellar, Dr. Daniel Brookhoff, and three of the four patients whose files were presented to the Board.

¶7. The testimony offered by the investigator, Mr. Washington, centered on a description of his search and a recitation of the information stated in the affidavit for administrative inspection and search warrant. On cross examination, Mr. Washington admitted he did not interview any of Dr. McFadden's patients and he did not speak with Dr. McFadden about any of his patients.

¶8. Dr. Patrick appeared as the Board's expert witness. Asked his opinion as to the proper management of chronic pain, Dr. Patrick stated he prefers to limit the patient's movement and, when necessary, use chronic medications preferably in the category of the nonsteroidal anti-inflammatory agents. Dr. Patrick further testified that patients who often have recurring exacerbations may require short term opioid[2] medications. He also stated that in his experience, patients with pain of spinal or vertebral origin seldom require the stronger opioid medications (such as Morphine and Demerol) and only then for a day or two. Dr. Patrick also testified that the overwhelming majority of patients who need short term opioid therapy can be treated with Codeine or Codeine-equivalent drugs such as Oxyhcodone and Hydrocodone. He added that it is quite rare that such patients require chronic opioid medications for a prolonged period of time.

¶9. Dr. McFadden testified that he regularly uses opioids in the treatment of patients with intractable pain. Dr. McFadden insisted that, contrary to what is charged in the complaint, he made a prior determination when nonaddictive substances would be effective. Dr. McFadden also stated that all medications were prescribed to his patients in the course of legitimate professional practice.

¶10. Dr. McGee, a general surgeon, serves on the Advisory Council for the American College of Surgeons, as Vice Chair of the Council on Managed Pain and Development, as Speaker of the House of Delegates at

the Mississippi State Medical Association, and previously as Speaker of the House of Delegates for the American Society of General Surgeons. Dr. McGee described Dr. McFadden as a trustworthy physician who takes meticulous care of his patients.

¶11. Dr. McFadden also offered the expert testimony of Dr. McKellar, a pain medicine specialist. Dr. McKellar testified that he regularly prescribes opioids for patients in intractable pain. Dr. McKellar also testified that he had reviewed the four patient files at issue, and in his opinion, Dr. McFadden's prescription of controlled substances for these patients was done in the course of legitimate medical practice. Dr. McKellar further testified that his review of the patient files revealed that Dr. McFadden had carefully monitored these patients and that the patients appeared to have suffered no harm under Dr. McFadden's care. While Dr. McKellar admitted he had not examined these patients, he stated that a review of the four patient files indicated that Dr. McFadden's treatment and evaluation of these four patients was reasonable and that Dr. McFadden had conducted a good faith examination of these patients. Dr. McKellar also stated that he thought Dr. McFadden's level of referrals to other doctors for alternative treatments indicated an admirable level of professionalism.

¶12. Dr. Brookhoff, another pain medicine specialist, also testified on behalf of Dr. McFadden. Dr. Brookhoff is board certified in internal medicine and medical oncology. He conducts frequent seminars and other meetings on pain management, has published numerous medical journals, and has written several book chapters concerning the treatment and management of pain. Like Dr. McKellar, Dr. Brookhoff examined the four patient files at issue. Dr. Brookhoff testified that in his opinion, Dr. McFadden's treatment of these patients was "in the course of legitimate medical practice," and it did not appear that any of these patients suffered any physical harm as a result of the controlled substances prescribed by Dr. McFadden. Dr. Brookhoff stated that it was his professional opinion that the controlled substances prescribed by Dr. McFadden were not excessive and that, for the most part, the medications prescribed by Dr. McFadden were very low potency medications. According to Dr. Brookhoff, Dr. McFadden's practice of referring patients to other physicians for second opinions and alternative or supplemental treatment suggests that Dr. McFadden was open to receiving advice and assistance from colleagues and that he was not keeping any secrets.

¶13. Three of the four patients at issue also testified at the hearing. Priscilla Lovelace, a charity patient who suffers from a lower back injury, testified that Dr. McFadden is an attentive doctor and that without his treatment, she "would continue using the emergency rooms to seek relief."

¶14. Jackie Tate testified that he suffers from constant pain in his right leg and his back, but other doctors are afraid to operate at his time for fear it may worsen his condition. Mr. Tate testified that Dr. McFadden has referred him to other doctors and that Dr. McFadden monitors his medications, counsels him, and personally examines him approximately every six weeks.

¶15. Dwight Kee testified that he suffers from back pain which radiates down his right arm, numbness in his fingertips, neck pain and severe headaches. According to Mr. Kee, he has seen orthopedists, neurologists, pain specialists, psychiatrists, internists, as well as, his family doctor in an attempt to obtain some relief. Mr. Kee stated that he talks with Dr. McFadden on the average of twice a week and that Dr. McFadden has made home visits to see him when necessary.

¶16. Mr. Kee further testified that parts of the affidavit which suggest he misused his medications were false. Mr. Kee stated that he once had a two week meeting in Chicago, and consequently, it was necessary

for him to obtain sufficient medication from Dr. McFadden for the trip. Mr. Kee also refuted the charge in the affidavit stating that Dr. McFadden placed him on a regimen of controlled substances without a prior determination that nonaddictive substances were ineffective. Mr. Kee explained that he had tried various non-controlled substances before he was prescribed controlled substances by Dr. McFadden. Mr. Kee concluded his testimony by stating that he received better treatment from Dr. McFadden than most doctors he had seen.

6. <u>The Board's Order</u>

¶17. Following the evidentiary hearing, the Board unanimously found Dr. McFadden guilty of the following:

> Three counts of violating Section 73-25-29(1)(m) and appellee's Rules and Regulations, Section IV.E "Pertaining to Prescribing, Administering and Dispensing of Medication," for failing to maintain a complete record of the examination, evaluation, and treatment, including documentation of the diagnosis and reason for prescribing controlled substances;
>
> Four counts of violating Section 73-25-29(1)(m) and appellee's Rules and Regulations, Section IV.F "Pertaining to Prescribing, Administering and Dispensing of Medication," for prescribing a controlled substance or other drug having addiction-forming or addiction-sustaining liability without a good faith examination or medical indication thereof; and
>
> Four counts of violating Section 73-25-29(1)(c), Section 73-25-29(1)(h)(iv), and Section 73-25-83(a) for prescribing drugs having addiction-forming or addiction-sustaining liability, otherwise than in the course of legitimate professional practice and being guilty of unprofessional conduct, which includes dishonorable or unethical conduct likely to deceive, defraud or harm the public.

For these violations, the Board suspended Dr. McFadden's medical license indefinitely, subject to an automatic stay conditioned on the following probationary terms:

> No permission to order, manufacture, distribute, possess, dispense, administer or prescribe any controlled substances listed in Schedules II, IIN, III, IIIN, and IV to any patient on an out-patient basis, until authorized to do so by prior written order of the Board, except for emergency-room treatment on condition that Dr. McFadden personally examines the patient and makes a determination as to the need thereof;
>
> No permission to order, manufacture, distribute, possess, dispense, administer or prescribe the medications Stadol, Nubain, Soma, Butalbital, and Dalgan to any out-patient, until authorized to do so by prior written order of the Board, except for emergency room treatment (as above);
>
> Compliance with all federal, state and local law regarding the practice of medicine, and the Board's rules pertaining to prescribing, administration and dispensing of medication;
>
> Periodic surveillance of Dr. McFadden's medical practice by the Board;
>
> Continuing medical education (50 hours annually), including the course entitled "Physician Education Program in Clinical, Legal and Ethical Issues in Prescribing Abusable Drugs," sponsored by the University of South Florida; and

Ten days' notice if Dr. McFadden leaves Mississippi to reside or practice elsewhere.

¶18. The Board's Order further provides Dr. McFadden with the right to petition the Board to release any or all of these probationary conditions after November 22, 2001, and states Dr. McFadden retains full privileges to prescribe controlled substances in Schedule V, with the exception of Buprenex.

¶19. Dr. McFadden appealed the Board's decision to the Hinds County Chancery Court. After the Chancery Court affirmed the Board's decision, Dr. McFadden brought the instant appeal raising two issues for the Court's consideration:

I. WHETHER THE DECISION OF THE BOARD WAS SUPPORTED BY SUBSTANTIAL EVIDENCE FOUND TO BE CLEAR AND CONVINCING OR WHETHER IT WAS ARBITRARY OR CAPRICIOUS?

II. WHETHER THE BOARD DENIED DR. McFADDEN'S CONSTITUTIONAL RIGHTS OF DUE PROCESS OF LAW GUARANTEED TO HIM BY BOTH THE CONSTITUTION OF THE STATE OF MISSISSIPPI AND THE UNITED STATES CONSTITUTION?

## LEGAL ANALYSIS

¶**20.** Judicial review of an administrative decision is limited. This Court recognizes that

> [o]ur Constitution does not permit the judiciary of this State to retry *de novo* matters on appeal from administrative agencies. Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law. When an administrative agency has performed its function, and has made the determination and entered the order required of it, the parties may then appeal to the judicial tribunal designated to hear the appeal. **The appeal is a limited one, however, since the courts cannot enter the field of the administrative agency. The court will entertain the appeal to determine whether or not the order of the administrative agency (1) was supported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. This rule has been thoroughly settled in this state.**

*Mississippi State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss. 1993) (quoting *Mississippi State Tax Comm'n v. Mississippi-Alabama State Fair*, 222 So. 2d 664, 665 (Miss. 1969)).

¶21. "The only grounds for overturning administrative agency action by the appellate process is that the state agency has acted capriciously, unreasonably, arbitrarily; has abused its discretion or has violated a vested constitutional right of a party. *Wilson*, 624 So. 2d at 489 (quoting *Melody Manor Convalescent Center v. Mississippi State Department of Health*, 546 So. 2d 972, 974 (Miss. 1989)).

¶22. "Moreover, there is a rebuttable presumption in favor of the action of an administrative agency and the burden of proof is upon one challenging its action." *Wilson,* 624 So. 2d at 489 (quoting *County Board of Education of Alcorn County v. Parents and Custodians of Students at Rienzi School Attendance Center*, 251 Miss. 195, 168 So. 2d 814, 818 (1964)).

¶23. While this standard of review is highly deferential, it is by no means a "rubber stamp." See *Wilson,*

624 So. 2d at 490.

Sufficiency of the Evidence

¶24. Because the licensure statutes and regulations at issue in this case are penal in nature, the Board is required to prove its case against Dr. McFadden by clear and convincing evidence, and the statutes and regulations at issue must be strictly construed in favor of Dr. McFadden. See **Hogan v. Mississippi Bd. of Nursing**, 457 So. 2d 931, 934 (Miss. 1984) "The judicial eye looks to see whether a fair-minded fact finder might have found the evidence clear and convincing that the offense had occurred and where that may be said, we will not disturb the Board's judgment." **Riddle v. Mississippi State Bd. of Pharmacy**, 592 So. 2d 37, 41 (Miss. 1991).

¶25. Dr. McFadden complains the Board's administrative decision was not supported by clear and convincing evidence. Dr. McFadden raises issues regarding the accuracy of Mr. Washington's affidavit, particularly the method used to calculate the dosages of controlled substances prescribed[(3)], the Board's findings of fact, and the relative credibility and weight to be accorded each party's witnesses, particularly the expert witnesses. Dr. McFadden's concerns about the accuracy of Mr. Washington's affidavit will be discussed below when we address Dr. McFadden's claim that he was denied his right to due process of law. The Court will now address Dr. McFadden's concerns about the Board's findings of fact and the relative credibility and weight to be accorded the parties' witnesses.

¶26. Issues of fact and credibility are the primary responsibility of the trier of fact. Accordingly, this Court should not reweigh the facts nor substitute its judgment for that of the fact finder as to credibility issues. The reviewing court "is only concerned with the reasonableness of the administrative order, not its correctness." **Mississippi Dep't of Envtl. Quality v. Weems**, 653 So. 2d 266, 281 (Miss. 1995). The question is simply "whether substantial evidence supports the findings made by the agency." **Id.**

**¶27.** The Board contends more than sufficient evidence was presented to the Board to satisfy the "substantial credible evidence" standard by which decisions of administrative boards are reviewed in Mississippi. The Board outlines the following facts for this Court's consideration:

Dwight Kee

¶28. During the period of February 24, 1995, through Janauary 2, 1996, Dr. McFadden issued to Mr. Kee fifty-six separate (56) prescriptions for a total of 2, 998 dosage units of controlled substances. On at least twenty one (21) separate occasions Dr. McFadden issued prescriptions for controlled substances to Mr. Kee at a time when the patient would not have been finished taking the same drug from a prior prescription issued by Dr. McFadden had the patient followed Dr. McFadden's own instructions as to daily rate of consumption for the drugs. Mr. Kee testified that he expressed concern to Dr. McFadden and other doctors about the drugs he was consuming and the fact that he may have a drug abuse problem. Dr. McFadden's medical records contain no reference to Mr. Kee's requests for premature refills (a probable indication that the patient is being oversupplied with medication) and no reference to Dr. McFadden's conclusion that Mr. Kee was the "best candidate for suicide of any patient in my practice."

¶29. During the profile period, Dr. McFadden issued fifteen (15) prescriptions to Mr. Kee in which Dr. McFadden recorded into the patient's medical record only the type of drug and quantity described. In each of these fifteen (15) instances, Dr. McFadden failed to record the patient's vital signs, any observation of the

patient's condition, or how the patient was progressing under his treatment plan. Dr. McFadden also issued Mr. Kee an additional eight (8) prescriptions for controlled substances with no corresponding entry whatsoever in the patient's medical record.[(4)] The Board argues Dr. McFadden's failure to record the issuance of a prescription and his failure to document the vital signs/observations regarding the patient into the patient's medical record violates Section IV.E and Section IV.F of the Board's rules and regulations "Pertaining to Prescribing, Administration, and Dispensing of Medication."

Patricia Lovelace

¶30. Between January 3, 1995, and January 26, 1996, Dr. McFadden issued Ms. Lovelace sixteen (16) prescriptions for a total of 2,700 dosage units of controlled substances. A review of Ms. Lovelace's medical record indicates she was avoiding surgery which could have alleviated her pain, and instead, she requested additional quantities of specific types of controlled substances, which Dr. McFadden prescribed. The Board claims this type of activity constitutes a "red flag" suggesting possible drug abuse. As to nine (9) of the sixteen (16) prescriptions issued to this patient, Dr. McFadden recorded in the patient's record only the name of the drug and quantity issued. Dr. McFadden failed to record any reference to the patient's vital signs, any observation of the patient's condition, or any information as to the status of the patient's course of treatment. The Board argues such omissions are violations of Section IV.E and Section IV.F of the Board's rules and regulations "Pertaining to Prescribing, Administration, and Dispensing of Medication."

Jeffrey Gilmore

¶31. Between January 12, 1995, and January 12, 1996, Dr. McFadden issued to Mr. Gilmore eighteen (18) prescriptions for a total of approximately 2,250 dosage units of controlled substances. In denying this patient's claim for permanent disability for workers' compensation, the Administrative Law Judge specifically found that Mr. Gilmore was "doctor shopping" for a disability rating when he initially consulted Dr. McFadden in November, 1994. The Administrative Law Judge also found that Dr. McFadden was known as a "physician who will render extended treatment based on a patient's subjective complaints of pain," and further found that Dr. McFadden's choice of treatment "was not required by the nature of [Gilmore's] injury. . . ." Of the eighteen prescriptions Dr. McFadden issued to Mr. Gilmore during the profile period, four (4) of them were issued with no corresponding entry in the patient's medical record. As to nine (9) of the other prescriptions, Dr. McFadden merely recorded the name of the drug and the quantity prescribed. The Board argues this is yet another violation of Section IV.E and Section IV.F of the Board's rules and regulations.

Jackie Tate

¶32. Between January 4, 1995, and January 16, 1996, Dr. McFadden issued thirty one (31) prescriptions for a total of 3,036 dosage units of controlled substances to Mr. Tate. Dr. McFadden described this patient as "one of the top 4 or 5 possible suicide candidates in my practice", yet he failed to refer this patient to a specialist for a psychiatric evaluation. Instead, Dr. McFadden continued to prescribe Mr. Tate an average of eight (8) dosage units of narcotics per day and, at times, up to thirteen (13) dosage units per day.

¶33. The Board claims Dr. McFadden also issued these prescriptions at a time when he knew or should have known of the patient's possible drug abuse. Nineteen (19) of the thirty one (31) prescriptions issued during the profile period were issued early, i.e., at a time when the patient would still have had the medication if he were consuming it at the proper daily rate.

¶34. Eight (8) of the thirty one (31) prescriptions Dr. McFadden issued to Mr. Tate were issued with no corresponding entry in the patient's medical record. Dr. McFadden also issued this patient an additional ten (10) prescriptions in which he recorded only the drug and quantity prescribed, i.e., Dr. McFadden failed to record the patient's vital signs, any observation of the patient's condition, or any notation concerning the status of the patient's treatment plan. The Board concludes these practices are violations of Section IV.E and IV.F of the Board's rules and regulations "Pertaining to Prescribing, Administration and Dispensing of Medication."

¶35. The Board argues the above facts demonstrate that it reasonably concluded Dr. McFadden was in violation of the rules and regulations of the Board "Pertaining to Prescribing, Administration and Dispensing of Medication." The Board argues these facts also support the Board's conclusion that Dr. McFadden prescribed drugs having addiction-forming or addiction-sustaining liability otherwise than in the course of legitimate professional practice. The Board further concludes that this pattern of behavior, which Dr. McFadden continued to engage in after being warned by the Board, constituted unprofessional conduct, including dishonorable or unethical conduct likely to harm the public.

¶36. More specifically, the Board concludes the evidence presented at the hearing revealed that on at least forty three (43) separate occasions Dr. McFadden prescribed controlled substances without maintaining a complete record of his examination, evaluation, and treatment of the patient, including a documentation of his diagnosis and reason for prescribing, dispensing, or administering the controlled substance in violation Section IV. E. The Board also concludes that on an additional twenty (20) occasions, Dr. McFadden made no entry whatsoever in the patient's medical record to reflect that he had issued the patient a prescription for controlled substances. The Board also points out that these omissions on the part of Dr. McFadden took place after the Board's 1992 warning letter reminding him of his duty to comply with the Board's rules and regulations. The Board asserts that on this basis alone, its decision to suspend Dr. McFadden's license to practice medicine in this State was supported by substantial credible evidence.

¶37. The Board also claims Dr. McFadden's forty (40) violations of Section IV.F justify its action in restricting his license to practice medicine. This Section of the Board's rules and regulations "Pertaining to Prescribing, Administration and Dispensing of Medication" provides that "[n]o physician shall prescribe, administer or dispense any controlled substance or other drug having addiction-forming or addiction-sustaining liability without a good faith prior examination and medical indication therefore." The Official Comment to this Section states that:

> proper medical practice require[s] that, upon any encounter with a patient, in order to establish proper diagnosis and regimen of treatment, a physician must take three steps: (a) take and record an appropriate medical history, (b) carry out an appropriate physical examination, and (c) record the results. The observance of these principles as a function of the 'course of legitimate professional practice' **is particularly of importance in cases in which controlled substances are to play a part in the course of treatment**."

Section IV.F, Official Comment. (emphasis added). The Official Comment further states that in determining whether a physician acted in "good faith" in issuing prescriptions for controlled substances, the Board will look to whether "the physician dispens[ed] drugs to patients having no medical need, when the physician knew or should have known that the patients were addicts" and "repeated refills over relatively short periods of time or the issuance of prescriptions at a time when the patient should not have been finished

taking the same medication from a prior prescription had the prescription directions been properly followed or the correct dosage taken." Section IV.F., Official Comment. The Board asserts that in the cases of patients Mr. Kee and Mr. Tate, Dr. McFadden prematurely issued at least forty (40) prescriptions for controlled substances.

¶38. Furthermore, according to the Board, Dr. McFadden's one hundred and three (103) violations of Section IV.E and Section IV.F constitute "dishonorable or unethical conduct likely to deceive, defraud or harm the public." Section 73-25-29(8)(d) of the Mississippi Code states that "unprofessional conduct" such as "dishonorable or unethical conduct likely to deceive, defraud or harm the public" constitutes grounds for the Board to suspend, revoke or restrict a physician's license to practice medicine in Mississippi. Miss. Code Ann. § 73-25-29 (8) (d); See also Miss. Code Ann. § 73-25-83 (a) (authorizing the Board to discipline a physician for dishonorable or unethical conduct likely to deceive, defraud or harm the public). In its November 22, 1996, Order, the Board concluded that Dr. McFadden's repeated violations of the rules pertaining to controlled substance record keeping/patient monitoring constituted "unprofessional conduct" within the meaning of Section 73-25-29(1).

¶39. The Board also notes that under Section 73-25-29(13) "[v]iolations of any provision(s) of the Medical Practice Act or the rules and regulations of the [B]oard or of any order, stipulation or agreement with the [B]oard" are action giving the Board authority to suspend, revoke or restrict a physician's license to practice medicine in Mississippi. Miss. Code Ann. § 73-25-29(13). The Board argues that its disciplinary sanctions against Dr. McFadden were clearly authorized by these statutes governing such actions.

¶40. The Board further asserts that the expert testimony offered at the hearing clearly established that Dr. McFadden's prescribing practices were outside the course of legitimate professional practice and amounted to unprofessional conduct. The Board's expert Dr. Patrick concluded that Dr. McFadden had issued prescriptions outside the course of legitimate professional practice to each of the four patients at issue. Dr. Patrick also concluded that Dr. McFadden issued prescriptions for controlled substances without proper medical indication when he stated that "in virtually every case here, certainly three of the four cases, there was just insufficient [medical] evidence to put these patients even on short-term opioid [controlled substances], because the diagnosis the diagnosis is either controversial or nonexistent." Dr. Patrick further concluded that Dr. McFadden's prescribing practices amounted to unprofessional conduct likely to harm the public. Concerning Ms. Lovelace, Dr. Patrick concluded that "[i]t is inconceivable to me that a knowledgeable physician would place such a patient on six to seven Tylenol Number 3's per day for long-term ongoing management of a pain problem diagnosed as fibromyalgia." Regarding Mr. Gilmore, Dr. Patrick concluded that the volume of controlled substances Dr. McFadden prescribed "was totally inappropriate." Concerning the volume of controlled substances prescribed to Mr. Tate, Dr. Patrick stated he "could not find adequate basis [or] anything appropriate about that."

¶41. Finally, the Board alleges that Dr. McFadden's own admissions support the Board's decision to suspend his medical license. The Board notes that Dr. McFadden is a "self trained" pain medicine specialist. The record reveals Dr. McFadden had no residency or internship training in any speciality which involves the practice of pain management, i.e., anesthesiology, neurosurgery, neurology, orthopaedics, etc. Dr. McFadden is a pediatrician by formal medical training.

¶42. The Board also argues that during his testimony Dr. McFadden acknowledged having issued prescriptions for controlled substances with directions to the patient that were contrary to the maximum

daily dosages set forth in the Physicians' Desk Reference (i.e., he told Mr. Kee to take one to two Vicodin ES every four to six hours). The Board claims that Mr. Kee could have taken up to six Vicodin ES per day per Dr. McFadden's directions. The Board states that the maximum daily dosage recommended by the Physicians' Desk Reference for Vicodin ES is five per day, i.e., the specific warning being that "[t]he total 24 hour dose should not exceed five tablets."

¶43. The Board also directs this Court's attention to Dr. McFadden's admission that the advice contained in the Board's 1992 warning letter concerning his controlled substance prescribing/patient monitoring practices was good advice and Dr. McFadden's comment that he "knew all that. . . and was carrying out most of that." In addition, the Board calls attention to Dr. McFadden's acknowledgment that the Board's rules and regulations concerning patient records require physicians to make a record of the examination, evaluation, and treatment of the patient, including a diagnosis and reason for prescribing any controlled substances. When asked if he understood that "just entering a prescription only" in a patient's file was insufficient, Dr. McFadden responded that he "never understood it that way." Concerning the Board's record keeping/patient monitoring rules, Dr. McFadden further stated that "I had no knowledge that you people wanted something in the record. I'll have to change my whole practice."

¶44. The Board also notes that when confronted with the fact that he had issued twenty one (21) premature prescriptions for controlled substances to Mr. Kee, Dr. McFadden claimed "the problem was the pharmacist here because there is no way that the pharmacist should have filled some of these prescriptions as early as he did. And I have no knowledge that Dwight [Kee] was taking so many of these pills as he was sometimes. So that was a mistake on my part." The Board notes Dr. McFadden's expert Dr. McKellar admitted that two or three premature refills to a patient would indicate there "is a problem," and that 21 premature refills "would be pretty high." Dr. McKellar also stated that premature refills would be "a red flag to you that there's a problem" and could indicate that the patient is hoarding the medication or disbursing it to others.

¶45. The Board argues these responses exemplify Dr. McFadden's failure to properly manage patients to whom he was prescribing large quantities of controlled substances having addiction forming qualitites. The Board also states that it is not surprising that Dr. McFadden had "no knowledge that Dwight [Kee] was taking so many of these pills," in light of the fact that he failed to properly record twenty three (23) of the fifty six (56) prescriptions he issued to Mr. Kee during the profile period. The Board also points out that when asked to account for these premature prescriptions, Dr. McFadden tried to place responsibility on the pharmacist who had simply filled the prescriptions according to Dr. McFadden's orders. The Board further notes that regarding Dr. McFadden's nineteen (19) premature prescriptions issued to Mr. Tate, Dr. McFadden acknowledged that the quantity of drugs prescribed was "excessive-- if he took it all." In addition, the Board reminds this Court that Dr. McFadden admitted to having issued prescriptions without the proper record keeping notations in the patient's medical files. Dr. McFadden explained that he failed to maintain his patient files properly because of a "misunderstanding" of the Board's rules and regulations.

¶46. The standard of review applicable in the instant case requires this Court to give great deference to the trier of fact concerning issues of fact as well as the credibility of witnesses. As previously stated, the reviewing court "is only concerned with the reasonableness of the administrative order, not its correctness." *Weems*, 653 So. 2d at 281. Based on the substantial evidence discussed above, we conclude that the record supports the reasonableness of the Board's decision to suspend Dr. McFadden's medical license.

¶47. Dr. McFadden misconstrues several cases claiming they support his claim that the Board should not have taken this disciplinary action against him. Dr. McFadden cites *Miller v. State Bd. of Pharmacy*, 262 So. 2d 188, 191 (Miss. 1972), for the proposition that poor record keeping in the dispensing of controlled substances is, of itself, insufficient to support the revocation of a pharmacist's license. However, in *Miller*, the administrative board was reversed because "no statute, or rule or regulation of the Board . . . has been cited to us as having established any standards for the keeping of records by pharmacists." *Miller*, 262 So. 2d at 190. The *Miller* case is distinguishable from the instant case. Dr. McFadden violated Sections IV.E and IV.F of the Board's rules and regulations "Pertaining to Prescribing, Administration, and Dispensing Medication" which clearly establish the standard for physicians in keeping medical records.

¶48. Dr. McFadden also relies upon *Hogan v. Mississippi Bd. of Nursing*, 457 So. 2d 931, 935-36 (Miss. 1984), in which this Court reversed an administrative board's finding that a nurse had misappropriated controlled substances. However, *Hogan* involved different statutes and different substantive allegations than those at issue here. *Id*. at 932-33. In *Hogan*, the question was whether a nurse misappropriated supplies of controlled substances held by her employer. *Id*. Here, the question is whether a physician failed to follow the rules requiring him to maintain specific records concerning treatment of his patients. We conclude that *Hogan* is not controlling here on this issue.

¶49. In addition, Dr. McFadden relies upon the foreign jurisdiction cases of *McNiel v. Tennessee Bd. of Med. Exam'rs*, No. 01-A-01-9608-CH-00383, 1997 WL 92071 (Tenn. Ct. App. March 5, 1997), *Johnston v. Department of Prof. Reg., Bd. of Med. Exam'rs*, 456 So. 2d 939 (Fla. Dist. Ct. App. 1984), and *In re DiLeo,* 661 So. 2d 162 (La. Ct. App. 1995). The *McNiel* case involved the question of whether the opinion of a single expert witness constituted substantial, credible evidence that the defendant physicians had overprescribed controlled substances. *McNiel*, 1997 WL 92071 at *1-3. The *Johnston* case and the *DiLeo* case both involved allegations that the defendant physician overprescribed controlled substances to certain patients. *Johnston*, 456 So. 2d at 939-40. However, there was no allegation in any of these cases that the defendant physician failed to maintain proper records of the prescriptions at issue. Hence, we find that Dr. McFadden's reliance on these cases is misplaced.

## Due Process

¶50. Dr. McFadden argues he was denied a fair and impartial hearing before a neutral tribunal in violation of his constitutional right to due process of law. More specifically, Dr. McFadden contends that he was denied due process of law because "the Board acted as investigator, prosecutor and judge." Dr. McFadden also asserts that "[t]he comments and actions of the Board show that it had abdicated its role as a neutral arbiter and was present simply to assist in proving Dr. McFadden's guilt of the charges made." According to Dr. McFadden, "the questions and commentary by the [Board] members were not to ascertain the true facts regarding Dr. McFadden's administration of controlled substances for patients in intractable pain, but to condemn him." Dr. McFadden claims "[t]he Board repeatedly manifested its bias toward Dr. McFadden and his witnesses throughout the hearing."

¶51. Both the United States and Mississippi Constitutions guarantee Dr. McFadden due process of law before an administrative agency. U.S. Const. Amend. XIV; Miss Const. Art. 3, § 4. Administrative proceedings "must be conducted in a fair and impartial manner, free from any suspicion of prejudice, unfairness, fraud or oppression." *Mississippi State Bd. of Health v. Johnson*, 197 Miss. 417, 19 So. 2d 445, 447 (Miss. 1944). "Due process always stands as a constitutionally grounded procedural safety net in

administrative proceedings." ***McGowan v. Mississippi State Oil & Gas Bd.***, 604 So. 2d 312, 318 (Miss. 1992), <u>cert. denied</u>, 506 U.S. 1052 (1993).

¶52. Dr. McFadden suggests the combination of investigative and adjudicative functions of the Board resulted in unfairness to him. For example, he complains the medical consultant who assisted in the investigation sat with the Board and fully participated with the Board in making its findings of fact and its ultimate opinion. In support of this argument, Dr. McFadden cites ***McGowan***, 604 So. 2d at 316. However, due process is not offended simply because the Board performed both investigative and adjudicative functions. ***McGowan***, 604 So. 2d at 315-16; see also *<u>Winthrow v. Larkin</u>*<u>, 421 U.S. 35, 56 (1975)</u> (noting "It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedures Act, and it does not violate due process of law.") (footnote omitted). Accordingly, Dr. McFadden's complaint "that the Board acted as investigator, prosecutor and judge" is without merit.

¶53. Dr. McFadden also alleges the Board was biased or prejudiced against him, a situation that would be impermissible under both the United States and Mississippi Constitutions. This Court has held "there is a presumption that the officers conducting the hearing and the members of the Board behave honestly and fairly in the conduct of the hearings and in the decision-making process." ***United Cement v. Safe Air for the Env't, Inc.***, 558 So. 2d 840, 842 (Miss. 1990) (<u>citing</u> ***Harrison County Bd. v. Morreale***, 538 So. 2d 1196, 1202 (Miss. 1989)). "Absent some showing of personal or financial interest on the part of the hearing officer or evidence of misconduct on the officer's part, this presumption is not overcome." ***United Cement***, 558 So. 2d at 842-43.

¶54. The Board reminds this Court that administrative hearings are unlike courtroom proceedings, in that the formalities of practice, procedure and evidence are relaxed. See ***Riddle***, 592 So. 2d at 43. The Board contends that "a contentious atmosphere can be expected in many administrative hearings, and an attitude bordering on partisanship and even hostility, as reflected in exchanges between the adjudicator and the charged party does not in and of itself prove bias." See 2 Am. Jur. 2d, <u>Administrative Law</u> § 50 at 73(1994)(footnote omitted).

¶55. At Dr. McFadden's hearing, Board members questioned the witnesses, as is common practice in administrative hearings. While several comments made by Board members could be fairly characterized as hostile, we conclude these comments do not amount to unfair prejudice or bias against Dr. McFadden.

¶56. Dr. McFadden misconstrues several comments made by members of the Board and mistakenly reaches the conclusion the Board was biased against him. For example, Dr. McFadden claims that Board member Dr. Richard Riley questioned Dr. McFadden's medical expertise. Dr. Riley's comments, when read in context, reveal that Dr. Riley simply questioned Dr. McFadden's expertise in diskoprophy because Dr. McFadden had previously testified he had no formal training in this speciality, yet he claimed to be "one of the world experts" in this field. Dr. McFadden also alleges that Dr. Riley wrongfully suggested that Dr. McFadden was "dangerous." Dr. Riley actually questioned whether a lack of formal training might be dangerous.

¶57. Dr. McFadden also argues that the Board insinuated that he was not an authority on diseases. However, in response to Dr. McFadden's comment that he is a "world expert" on diskoprophy and an expert on disc disease and spine disease, Dr. Riley's question "what makes you an authority on disc disease

and facet disease and spine disease?" does not amount to prejudice or bias against Dr. McFadden.

¶58. Dr. McFadden also claims that on two occasions Dr. Riley stated that Dr. McFadden's testimony was "meaningless." Again, Dr. McFadden misconstrues Dr. Riley's statements. Dr. Riley's first comment, "this is meaningless", was in response to Dr. McFadden "speaking 90 miles an hour" about the validity of data he relied upon. The second comment involved a question posed to Dr. McFadden as to what made him an authority on disc disease, facet disease and spine disease. Dr. McFadden answered he had "done hundreds of hours of research on [his] own time, of [his] own choosing, and spent many thousands of dollars of [his] own money." To this answer, Dr. Riley responded "[m]eaningless."

¶59. Dr. McFadden also contends Dr. Riley stated that Dr. McFadden was "being cruel" to his patients and stated that Dr. McFadden's testimony "will never convince me." Dr. Riley's comment about Dr. McFadden "being cruel" to his patients was in reference to patients whom Dr. McFadden had diagnosed as being suicidal, yet he failed to record this information in the patients' medical records or refer them to a psychiatric specialist. Dr. Riley noted that it would be "cruel" to these patients to "give them all the narcotics they want. They may be suicidal, and you give them narcotics, and narcotics cause personality changes." Furthermore, Dr. Riley's comment "you'll never convince me" was made in the context of an exchange between Dr. Riley and Dr. McFadden concerning the subject of alcoholism. Dr. Riley concluded the discussion by stating "I'll never convince you and you'll never convince me." Read in context, these comments do not demonstrate bias or impartiality; and therefore, this argument is without merit.

¶60. Dr. McFadden also contends that his witness Priscilla Lovelace, whom he characterizes as a "mentally slow charity patient," was "attacked with vengeance" by the Board. At the hearing, Dr. Freda Bush asked Ms. Lovelace several questions, including whether Ms. Lovelace was compensating Dr. McFadden for his services. [(5)] A review of the record reveals Dr. Bush was merely trying to clarify a confusing area of Ms. Lovelace's testimony.

¶61. Dr. McFadden also refers to the Board's more recent investigation of him, involving events subsequent to the disciplinary action at issue. Dr. McFadden claims this conduct constitutes "a pattern and practice of harassment and intimidation practiced by this Board to do harm to Dr. McFadden." Dr. McFadden's reference to this more recent investigation is not relevant to the issues presently before this Court. See *Turner v. Nicolson*, 151 Miss. 325, 117 So. 329, 331 (1928) (holding the appellate court could only consider the trial court record and any rights arising out of facts or matters occurring since trial below must be presented to the trial court); *Terry v. Superintendent of Ed.*, 211 Miss. 462, 52 So. 2d 13, 14 (1951) (stating appellate courts "review only such matters as were considered by the lower court").

¶62. Dr. McFadden also argues that the affidavit filed by Mr. Washington was "riddled with errors." First, Dr. McFadden complains Counts I, VI and IX asserted against him in the affidavit alleged violations of a non-existent statute. While the initial draft of the affidavit contained a typographical error in these three counts (i.e., it cited Section 73-25-13 rather than 73-25-29 of the Code), this error was later corrected by the Board's counsel. Dr. McFadden also asserts that the patients' average daily consumption quantities calculated by investigators for controlled substance prescriptions issued by Dr. McFadden were "manifestly wrong." Specifically, Dr. McFadden alleges that in calculating the average daily consumption for each of the four patients at issue, the overall time period in which the drugs were consumed should be enlarged by the number of days allowed by the last prescription Dr. McFadden issued to each patient during the profile period. Mr. Washington testified that because the average daily consumption figures he calculated do not

include the final prescription Dr. McFadden issued during the period of time in question, the calculation does not take into account the time Dr. McFadden may have allotted for the patient to take the final prescription. The Board explains that the final prescription for each patient within the profile period was not included in the average daily consumption figures because the investigators had no way of knowing how quickly the patient would have consumed the last prescription, i.e., the investigators did not know if or when the patient would have sought his next refill because of the limited scope of the prescription profile.

¶63. Dr. McFadden also suggests that because there were no opening arguments in this case this somehow contributed to the alleged denial of his due process rights. First, it should be noted Dr. McFadden made no contemporaneous objection to the Board's decision to waive opening statements. Second, opening statements are often waived in cases where there is already a general understanding of the issues to be addressed. Therefore, we conclude this argument is without merit.

¶64. Finally, Dr. McFadden characterizes this case as "a disagreement among two groups of professionals about the appropriate course of treatment" for chronic non-malignant pain patients instead of a disciplinary action for improper patient monitoring and improper controlled substance prescribing practices. Dr. McFadden states that as a result of his "difference of opinion" as to the proper course of treatment for "chronic pain" patients, he "was severely punished."

¶65. Dr. McFadden's argument is supplemented by an *amicus curiae* brief which discusses governmental regulation over physicians' treatment of "chronic non-malignant pain" patients. In its *amicus curiae* brief, the American Pain Society and the American Academy of Pain Medicine advocate public policy arguments relative to the physicians' use of controlled substances: (1) chronic pain is a serious medical condition, (2) long-term opioid treatment for chronic pain is medically accepted, and (3) the long-term sanctioning of a physician for prescribing opioid treatment for chronic pain absent a clear showing that the physician acted outside the course of professional practice will deter other physicians.

¶66. A Louisiana court recently rejected a "difference of professional opinion" argument similar to the one asserted by Dr. McFadden in this case. ***Holladay v. Louisiana State Bd. of Med. Examiners***, 689 So. 2d 718, 725-26 (La. Ct. App. 1997) (sanctioning the defendant physician for failure to monitor patients and failure to examine patients before prescribing narcotics to them). The physician argued that "a conflict exists between two divergent schools of thought, one more liberal than the other, as to the appropriate manner of prescribing controlled substances in the treatment of chronic non-malignant pain," and that "because of this conflict and in absence of any governing written standards, the Board cannot find [the physician] in violation of [the applicable rules]." *Id*. at 726. The Louisiana court held that "[the physician's] argument misses the point. It is not [the physician's] liberal prescribing philosophy which resulted in the Board's decision, rather it was [the physician's] failure to adhere to basic precepts of medical practice or to follow the appropriate medical standards that were his violations. Certain basic standards are recognized by both schools of thought." *Id*. Similarly, this Court concludes that Dr. McFadden misses the point. It was Dr. McFadden's failure to record the issuance of numerous controlled substance prescriptions, among other things, in violation of the Board's rules and regulations that resulted in this disciplinary proceeding.

## CONCLUSION

¶67. Mississippi law mandates that when a physician prescribes controlled substances, he or she must maintain accurate records of such prescriptions for each patient treated. Dr. McFadden failed to maintain such records not only in violation of Mississippi law but also in contravention of prudent medical practice.

¶68. The record substantially supports the Board's findings of fact, and consequently, the Board's decision to place restrictions on Dr. McFadden's ability to practice medicine in this State was not arbitrary or capricious. Also, a fair reading of the record reveals that Dr. McFadden was not denied his right to due process of law and that he received a fair and impartial hearing. Accordingly, the judgment of the Hinds County Chancery Court is

**¶69. AFFIRMED.**

**PITTMAN, P.J., BANKS, McRAE, ROBERTS, SMITH AND WALLER, JJ., CONCUR. PRATHER, C.J., AND MILLS, J., NOT PARTICIPATING.**

1. In April 1988, a follow-up inspection to the DEA investigation revealed that all corrective measures outlined in the letter of admonition were identified as being maintained by Dr. McFadden.

2. "Opioids" constitute a class of natural and synthetic substances used medicinally to control pain. Although the term was originally used to refer only to synthetic compounds chemically similar to the natural opioids, such as methadone, current usage includes natural substances derived from the sap of the opium poppy, such as morphine and codeine. See Marc Galanter & Herbert Kleber, Textbook of Substance Abuse Treatment 191 (1994) (editors' note).

3. Specifically, Dr. McFadden complains the method employed by the Board was simply a counting of pills and such a method fails to recognize that many of the prescriptions can be dispensed in various strengths, i.e., 15 mg to 300 mg. Dr. McFadden claims he consistently prescribed the lower strengths. He also complains the investigator failed to count the days of the last prescriptions, thereby rendering the entire calculation wrong. Finally, Dr. McFadden claims the investigator failed to recognize that many of the prescriptions at issue could be taken at the same time.

4. Section IV.E of the rules and regulations requires that when a physician issues a prescription for controlled substances, he must not only enter the name, dose, strength and quantity of the controlled substance, but he must also show a complete record of the examination, evaluation, and treatment of the patient. Comment One of the Board's rules and regulations advises physicians that the "failure to record in patient file prescriptions for controlled substances issued or failure to record patient visits" is one of the criteria which the Board considers when determining whether a "good faith prior examination or medical indication" exists.

5. The actual question by Dr. Bush was "[s]o you've been seeing him for a year, and you've paid him nothing? Okay. I'm not trying to embarrass you. It's just that you said that you pay him something."