IRVING, J.,
for the Court.
¶ 1. Lynn Laughlin filed an application for disability benefits with the Public Employees’ Retirement System (PERS). The PERS Medical Board (Medical Board) denied Laughlin’s request for benefits after concluding that she was not permanently disabled. Laughlin appealed to the Disability Appeals Committee (Committee), which recommended to the PERS Board of Trustees that the benefits be denied. The Board of Trustees agreed with the recommendation. Laughlin then appealed to the Hinds County Circuit Court, which affirmed the decision of the Board of Trustees. Aggrieved, Laughlin appeals and asserts: (1) that the circuit court erred in finding that PERS’s decision to deny her benefits is supported by substantial evidence and (2) that her due process rights to a fair hearing were violated.
¶ 2. Finding no reversible error, we affirm the judgment of the circuit court.
FACTS
¶ 3. On April 11, 2003, Laughlin filed an application for non-duty related disability benefits. Thereafter, on April 22, 2003, she resigned from her position with the Calhoun County Public School System after working for over ten years as a teacher. The Medical Board first reviewed Laughlin’s case on August 28, 2003. A PERS disability benefit analyst requested that Dr. David Collipp, a former member of the Medical Board,[1] perform an independent medical examination of Laughlin.
¶ 4. Dr. Collipp examined Laughlin on October 7, 2003. He noted that Laughlin had undergone neck surgery sixteen years earlier and had undergone followup neck surgery in 1999. Dr. Collipp also noted that Laughlin had had a second surgery in 1999. Additionally, Dr. Collipp stated that Laughlin was evaluated for bursitis of her left hip and that she complained of neck, low back, left hip, right hand, and right arm pain.
¶ 5. Dr. Collipp’s physical examination revealed that Laughlin had no abnormal *156 pain behaviors or pain magnification. He concluded that Laughlin had normal tone and motor power for her bilateral upper and lower limbs, as well as normal bilateral upper and lower limb ranges of motion, which included her shoulders, elbows, wrists, digits, hips, knees, and anides. Dr. Collipp also noted that Laughlin had a decreased cervical range of motion. Dr. Collipp also made the following notation: “[n]ormal gross mental status examination is demonstrated, with some passive-aggressive, and narcissistic personality traits noted.” Finally, Dr. Collipp concluded that Laughlin is capable of performing the work described in her job description.
¶ 6. Thereafter, on November 3, 2003, the Medical Board denied Laughlin’s request for disability benefits, finding that “there was insufficient objective evidence to support the claim that [her] medical condition prevents [her] from performing [her] duties as described as a [t]eacher.” Laughlin then appealed to the Committee on December 29, 2003, and PERS’s executive director, Frank Ready, set a hearing for January 24, 2004. Laughlin’s attorney promptly requested a continuance. He asked that the hearing be postponed until April. Ready granted Laughliris request for a continuance; however, he declined to set the hearing for April, setting it instead for February 20, 2004. Again, Laughlin’s attorney requested that the hearing be scheduled for a later date, arguing that he had not had sufficient time to determine if Laughlin’s medical files were complete. Ready denied Laughliris attorney’s request and noted that Laughlin’s attorney would have had sufficient time to review Laughliris medical records by the February 20 hearing date.
¶ 7. At the beginning of the hearing on February 20, the parties introduced a composite exhibit consisting of Laughlin’s medical file, membership file, and the PERS staff data sheet. The medical file contained the statement and medical records of the following additional physicians who had examined or treated Laughlin: Drs. R. Franklin Adams, O. Lynn Ham-blin, Edward R. Field, and R.A. McGuire. Laughliris admission and discharge records from Baptist Memorial Hospital for June 18, 2003, July 12 and 23, 1999, and September 20, 1999, were also included in the medical file.
¶ 8. Dr. Adams, a rheumatologist, noted that Laughliris principle diagnosis was scoliosis and spondylosis and her secondary diagnosis was fibromyalgia. Dr. Adams also noted that Laughlin’s “disability is manifest mainly by [the] level of pain.” However, on the “Statement of Examining Physician” form that Dr. Adams completed, he did not indicate that Laugh-lin suffered any permanent partial impairments, nor did he indicate whether she had reached maximum medical improvement. Also, Dr. Adams did not list any restrictions on the form where such restrictions were called for. After a thorough review of Dr. Adams’s medical records, we did not find any suggestion by Dr. Adams that Laughlin, despite experiencing severe pain, was permanently disabled. Dr. Hamblin declined to make a determination as to whether Laughlin was disabled because she concluded that she was not qualified to do so. On the other hand, Dr. Field, who completed his “Statement of Examining Physician” form on May 5, 2003, stated that he had seen Laughlin thirteen times in the last year and noted that she was at maximum medical improvement as of the date that he completed the form. Dr. Field concluded that Laughliris principal diagnosis was left SI joint dysfunction, which he opined was severe and that her secondary diagnosis was left pes bursitis, which he opined was mild. However, he did not find that Laughlin suffered from any permanent partial im *157 pairments, and as to restrictions, he stated the following: “self-limiting — pain reports with prolonged standing, walking, and sitting; pain reported with squatting and bending.” According to Dr. Field, Laugh-lin had a fair prognosis for recovery. Dr. McGuire, a back specialist, noted that Laughliris principal diagnosis was mild bursitis and concluded that she has a good prognosis for recovery. Dr. McGuire also concluded that Laughlin had reached maximum medical recovery.
¶ 9. During the hearing, Laughlin was examined by Drs. Joseph Blackston and Mark Meeks, as well as by a hearing officer. Laughlin testified about her duties as a teacher and the medical problems that she had experienced. She explained that she was employed as a computer applications teacher and that she taught over a hundred students per day, about twenty-one students per hour. Laughlin also testified that in addition to her classroom duties, she was required to work “outside duty5’ for an hour each day and “ball game duties” approximately three times a year.
¶ 10. During her examination by Dr. Blackston, Laughlin stated that even though she returned to work following her neck surgeries in 1999, she continued to have pain in her neck and right shoulder. Laughlin also stated that she still experiences pain in her arms and weakness in her right arm. Specifically, Laughlin testified that her right arm has been weaker than her left arm since the surgery that she had approximately fifteen years earlier. Dr. Blackston noted that Laughlin had been referred to Dr. Field, an orthopedic surgeon, by Dr. Adams. Dr. Blackston pointed out that Dr. Field diagnosed Laughlin as having scoliosis and referred her to Dr. McGuire. Laughlin testified that Dr. McGuire concluded that she had developed chronic bursitis in her hip. According to Laughlin, Dr. McGuire suggested that she wait seven months to see if the bursitis cleared up, but she stated that after seven months, the bursitis remained. Laughlin also noted that she only saw Dr. McGuire on that one occasion.
¶ 11. Dr. Blackston asked Laughlin about a functional capacity examination (FCE), which had been performed by David Brick, a licensed, registered occupational therapist. The report, also prepared by Brick, reflects that Laughlin can perform “light medium work.” Dr. Black-ston then asked Laughlin to state what is the heaviest thing she might be required to lift in a given work day. Laughlin responded that she often lifted boxes of computer paper, CPUs, and on occasion, “two-hundred-pound students.” Dr. Blackston then pointed out that according to the FCE, she could lift between twenty and twenty-five pounds. Laughlin then stated that she tries not to exert herself in that manner and added that following the FCE she could not get out of bed for two days. Laughlin testified that most of her problems are with her hips, thighs, shoulder, neck, and arm.
¶ 12. During her examination by Dr. Meeks, Laughlin stated that in December 2002, she had experienced dizziness and pain to the point where she could no longer perform her duties as a teacher. Laughlin further stated that she had been working on a part-time basis since the spring of 2002, per Dr. Adams’s suggestion. Dr. Meeks directed Laughlin’s attention to Dr. Field’s notes from February 14, 2003, following her FCE, wherein he noted that: “[The FCE] showed essentially that she is a light to medium worker. Right now, she is not in school and is much better. She states that she can’t handle the stress of that anymore. She may get a job elsewhere.”
¶ 13. During further questioning by Dr. Meeks, Laughlin described her pain and *158 how that pain is exacerbated by stressful situations. Laughlin explained that she was diagnosed with fibromyalgia in 1999 but noted that Dr. Field does not believe that fibromyalgia exists. Laughlin also noted that the fibromyalgia is secondary to the other problems that she suffers from.
¶ 14. In addition to the statements from Laughlin’s treating physicians, the Committee also considered Laughlin’s principal’s statement that Laughlin cannot perform the job of a teacher. The principal explained:
Teachers are required to constantly monitor students and their work. This requires constant walking, standing and bending over. Long days are frequent due to extra-curricular activities (7:30 a.m.-9:00 p.m.). Fine manipulation skills are constantly required of Ms. Laughlin due to her job as a teacher of computer [classes]. The above dut[ies] are painful for Ms. Laughlin.
¶ 15. Finally, the Committee also considered Brick’s findings that Laughlin met light-medium work ranges during the evaluation and that this would meet or exceed the work ranges required to be a teacher, leading to the ultimate conclusion that “[u]nless there is anything else medically to offer, she could be released back to her full and regular work duties.”
¶ 16. Following the hearing, the Committee recommended to the Board of Trustees that Laughlin’s request for disability benefits be denied, concluding that she is not permanently disabled within the definition provided in sections 25-11-113 and 25-11-114 of the Mississippi Code Annotated (Supp.2008). The Board of Trustees agreed with the Committee’s recommendation, and the circuit court affirmed the Board of Trustees’ decision. Laughlin now appeals.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 17. An appellate court’s “review of an administrative agency’s findings and decisions is limited: ‘an agency’s conclusions must remain undisturbed unless the agency’s order: (1) is not supported by substantial evidence, (2) is arbitrary or capricious, (3) is beyond the scope or power granted to the agency, or (4) violates one’s constitutional rights.’ ” Pub. Employees’ Ret. Sys. v. Howard, 905 So.2d 1279, 1284(¶ 13) (Miss.2005) (quoting Pub. Employees’ Ret. Sys. v. Marquez, 774 So.2d 421, 425(¶ 11) (Miss.2000)).
¶ 18. Laughlin asserts two reasons for her contention that the circuit court erred in finding substantial evidence to support PERS’s decision to deny her disability benefits. First, she contends that she proved that she meets the statutory definition of' disability, which is defined in Mississippi Code Annotated section 25-11-113(1)(a) (Supp.2008) as:
the inability to perform the usual duties of employment or the incapacity to perform such lesser duties, if any, as the employer, in its discretion, may assign without material reduction in compensation, or the incapacity to perform the duties of any employment covered by the Public Employees’ Retirement System (Section 25-11-101 et seq.) that is actually offered and is within the same general territorial work area, without material reduction in compensation....
¶ 19. To support her contention, Laugh-lin argues that the testimonies of two of her former colleagues, Diane Simon and Karen Owens, lend support to her contention that she is disabled to the point that she can no longer perform the duties of a schoolteacher. Simon taught with Laugh-lin during Laughlin’s final years and testified that she often observed that Laughlin appeared to be “almost in constant pain.” *159 Simon farther testified that, as a result, she and other teachers would often cover Laughlin’s “outside duty.” Owens testified that Laughlin often complained about suffering from neck, shoulder, and hip pain.
¶ 20. Second, Laughlin contends that the Committee erred in finding that “there is nothing in the record from Dr. Adams that states Ms. Laughlin is medically disabled.” Laughlin points out that Dr. Adams noted that her “disability is manifest mainly by [the] level of pain.” Accordingly, Laughlin argues that the Committee improperly dismissed her complaints of pain, concluding that it could not award her disability benefits because “[plain, unfortunately cannot be measured objectively.” Laughlin contends that pain can rise to a level that constitutes a disability and relies on Selders v. Sullivan, 914 F.2d 614 (5th Cir.1990) to support her contention.
¶ 21. Before we address the holding in Selders, we return briefly to a discussion of the medical findings of Dr. Adams. Laughlin is correct that Dr. Adams stated that her “disability is manifest mainly by [the] level of pain.” However, a proper assessment of Dr. Adams’s medical findings requires that this statement not be considered in isolation. As noted, Dr. Adams also did not indicate that Laughlin suffered any permanent partial impairment and did not place any restrictions on her. It seems only logical that if Dr. Adams considered Laughlin to be permanently disabled, he would have indicated that she suffered permanent impairment and would have coupled that finding with permanent restrictions. Therefore, we conclude that Dr. Adams was simply expressing an opinion regarding the level of pain that Laughlin was experiencing, rather than expressing an opinion that she was disabled because of the level of pain. We now return to our analysis of Selders.
¶ 22. In Selders, Curtis Selders appealed from the district court’s decision in favor of the Secretary of Health and Human Services which denied his application for Supplemental Security Income benefits following an on-the-job accident. Id. at 616-17. The United States Court of Appeals for the Fifth Circuit affirmed, finding that the decision of the administrative law judge was supported by substantial evidence. Id. at 616-18. The Selders court found as follows:
Selders claims to have the non-exertional impairments of significantly subaver-age mental capacity, chronic pain, and anxiety. Pain may constitute a non-ex-ertional impairment that can limit the jobs a claimant would otherwise be able to perform. There must be clinical or laboratory diagnostic techniques which show the existence of a medical impairment which could reasonably be expected to produce the pain alleged. Pain constitutes a disabling condition under the Social Security Act only when it is “constant, unremitting, and wholly unresponsive to therapeutic treatment.” There was substantial evidence here, however, from which the ALJ could conclude that Selders’[s] pain did not limit his ability to perform light work. The various tests, x-rays, and diagnoses repeatedly indicated that Selders had no significant orthopedic or neurological problems.... There was no medical evidence to support chronic pain of a nature that would limit Selders’[s] work abilities entirely, and several of the doctors who examined him indicated that he could return to work and resume normal activities.
Id. at 618-19 (internal citations omitted). We note at the outset that Selders is distinguishable from our case, as Selders was seeking a determination of disability pursuant to the provisions of the Social Secu *160 rity Act, not pursuant to the provisions of the Mississippi Public Employees’ Retirement System. Nevertheless, we fail to see how Selders helps Laughlin’s position. In fact, it appears that Laughlin and Selders aré similarly situated. As was the case with Selders, no doctor in Laughlin’s case concluded that the pain that she alleges to experience prevents her from returning to work. As a matter of fact, the record reveals the opposite, as Dr. Collipp concluded that Laughlin is capable of working, specifically as a schoolteacher. Further, the FCE specifically indicates that Laugh-lin “could be released ... to her full and regular work duties,” unless there was something else to be offered medically. Each of the physicians’ medical records indicate that Laughlin either had reached maximum medical improvement or that the physicians had nothing else to offer her medically.
¶ 23. Before turning to Laughlin’s last issue, we think it is appropriate to mention two opinions rendered by this Court: Stevison v. Public Employees’ Retirement System of Mississippi, 966 So.2d 874, 875(¶ 1) (Miss.Ct.App.2007) and Public Employees’ Retirement System of Mississippi v. Waid, 823 So.2d 595, 598(¶ 12) (Miss.Ct.App.2002). In each of these cases, on facts very similar to the facts in today’s case, we either reversed or approved the circuit court’s reversal of PERS’s decision denying disability benefits to the claimants. However, these cases are distinguishable from the case before us, as in each of them a physician stated emphatically that the claimant was disabled. See Stevison, 966 So.2d at 880(¶ 19); Waid, 823 So.2d at 598(¶ 10). Unlike the physicians in Stevi-son and Waid, all of the physicians in our case either offered no opinion regarding Laughlin’s disability or concluded that she was not disabled.
¶ 24. We now turn to Laughlin’s argument as it relates to her due process rights being violated. It is well settled that “[a]dministrative proceedings should be conducted in a fair and impartial manner, free from any suspicion of prejudice or unfairness.” Dean v. Pub. Employees’ Retirement Sys., 797 So.2d 830, 837(¶ 27) (Miss.2000) (citing McFadden v. Miss. State Bd. of Med. Licensure, 735 So.2d 145, 158(¶ 53) (Miss.1999)). Laughlin asserts that her due process rights to a fair hearing were violated in two respects: (1) when her request for a continuance was denied and (2) when a PERS employee was instructed, during Laughlin’s hearing, not to answer questions regarding the number of independent examinations that Dr. Collipp had performed for PERS in the previous year. We briefly address both of Laughlin’s contentions.
¶ 25. First, Laughlin asserts that Ready erred in denying her attorney’s request that the hearing be scheduled for April because she did not have sufficient time to “ensure that all medical records [were] obtained, that medical reports from treating or consultive physicians that may [have been] helpful to the prosecution of her disability case be obtained, and that lay opinions ... that may be helpful to her case be obtained.” As noted, Laughlin appealed PERS’s initial decision in December 2003, and Ready granted Laughlin’s attorney’s request to postpone the hearing from January 26, the date the hearing was initially scheduled to be heard, until February 20. We find no error with Ready’s decision, as there is nothing in the record which suggests that Ready treated Laugh-lin unfairly or that she was prejudiced by his decision to deny her a continuance. The record reflects that Laughlin had at least forty-two days to gather documents in preparation for the hearing. The record further reflects that on the day of the *161 hearing, Laughlin did not indicate or suggest in any manner whatsoever that she needed additional time or that there were pertinent medical records which she had not been able to obtain. Therefore, we find no merit to this issue.
¶ 26. Second, Laughlin claims that she was not afforded a fair hearing because Ready instructed Sharon Roberts, a PERS employee, not to answer a question regarding the number of independent medical examinations that Dr. Collipp had performed for PERS in the previous year. On this point, the record reflects the following exchange between Roberts and Laughlin’s áttorney:
Q. What was the date of the last time Dr. Collipp reviewed [a case]?
A. Probably in April.
Q. Of 2003?
A. Yes.
Q. Now, I assume Dr. Collipp got paid for his services on the medical board?
A. Yes.
Q. And Dr. Collipp, you would agree, has done in the past independent medical examinations for the Retirement System?
A. I would not—
Q. I said in the past?
A. In the past, but I would say in the last — since I’ve been an analyst, I don’t believe he has because it would be a conflict of interest.
* * * *
Q. But it’s you[r] testimony that Dr. Collipp did not, in any manner, review Ms. Laughlin’s claim.
A. He did not.
Q. Did you ever discuss it with Dr. Collipp whether or not he ever reviewed it?
MS. BOWERS: I’m going to object. She testified that Dr. Collipp was not a member of the medical board. When her case was reviewed, he was no longer reviewing any files with PERS.
MR. LUTER: I’ve got a right to ask a few questions with regard to this case. If she says no, then that’s her answer, but I’ve got a right to ask a few questions of her.
HEARING OFFICER: I think she did answer that. He was no longer on the medical board as of May of 2003.
MR. LUTER: My question was, is she, herself, aware of whether of not Dr. Collipp ever reviewed any of Ms. Laughlin’s file.
A. I’m not aware that he did. Not to my knowledge.
Q. Not to your knowledge. Now, in the past, let’s say year, how many independent medical examinations has Dr. Collipp performed for the Retirement System?
MR. READY: Sharon, don’t answer that.
MR. LUTER: I want the record to reflect that the Executive Director is telling her not to answer.
HEARING OFFICER: I think the record should reflect that she’s already answered [that] she is not aware of any.
MR. LUTER: I just want the record to reflect that the Executive Director, Frank Ready, has directed her not to answer my question about how many independent medical examinations [Dr. Collipp] has performed for the Retirement System this year, and that’s a public record, and he’s directed her not to answer that question.
HEARING OFFICER: I think the record will reflect exactly what happened. Anything else, Mr. Luter?
*162 ¶27. Laughlin fails to inform us how the answer to the question of how many independent medical examinations Dr. Col-lipp had performed for PERS in the previous year would have aided her in her quest to receive disability benefits. The critical point of concern is not that Dr. Collipp performed a number of independent medical examinations for PERS but that he did not sit on the Committee that reviewed Laughlin’s claim and Roberts attested to this point. Thus, we fail to see how Ready’s instruction to Roberts denied Laughlin a fair and impartial hearing. We find no merit to this issue.
¶ 28. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P. JJ., GRIFFIS, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. KING, C.J., AND BARNES, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. Dr. Collipp ceased being a member of the Medical Board in May 2003.